Filed 11/17/14  P. v. Hunter CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058629 |
| v. | (Super.Ct.No. FVI023511) |
| OMAR HUNTER, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed.

Renee Rich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Kevin Vienna, Angela M. Borzachillo and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

1

Victim Kevin Mayberry was shot in the mouth and killed. Three men were seen jumping over a wall and leaving the scene. When interviewed by the police, two men admitted that they were there and they jumped over the wall; they both identified defendant Omar Hunter as the third man and as the shooter (although they retracted this identification at trial).

Mayberry was believed to have molested defendant's half-sister. The gun that fired the fatal shot was found in the house that defendant shared with members of his extended family. On the day the house was searched, defendant moved to Florida, leaving behind his belongings and his four-year-old son.

Defendant was found guilty of second degree murder. In a motion for new trial, he argued that his trial counsel had rendered ineffective assistance by:

1. Refusing to argue or introduce evidence that the shooter was Ronald Y., a member of defendant's household.

2. Refusing to call Rigoberto Y., another member of defendant's household, to give defendant an alibi.

3. Advising defendant not to testify.

The trial court denied the new trial motion. In this appeal, we hold that this was not error. Hence, we will affirm.

# I

## FACTUAL BACKGROUND

A.      *Testimony of Abilez*.

Albert Abilez lived in the Sunset View Apartments in Hesperia.  On January 29, 2006, in the afternoon, he was inside his apartment when he heard "a loud bang." Looking out of his window, he saw a white Lincoln in the parking lot.

Abilez also saw four young men, all African-American.  The biggest was about six feet two inches tall and weighed about 220 or 230 pounds.  The smallest was about five feet seven or eight inches tall and weighed about 150 pounds; he was wearing a white t-shirt.

The biggest man was moving away slowly.  The other three men were moving away faster, as if fleeing.  The smallest man reached into the car.  His two "buddies" indicated that he should hurry up.  He then ran to them.  All three of them jumped over a brick wall and "disappeared."

B.      *The Crime Scene*.

Police officers found the body of Kevin Mayberry lying near the parking lot.  He was big -- tall and heavyset.  He had been shot once, in the mouth.  A nine-millimeter bullet was recovered from his neck.

A trail of blood led from the body back to Mayberry's white Lincoln.  Inside the Lincoln, the police found a fired nine-millimeter bullet casing.  Blood patterns and tooth fragments indicated that Mayberry had been shot while sitting in the driver's seat.

3

Shoeprints, in three distinct patterns, were found just inside a cinder block wall bordering the apartment complex, just outside the wall, and going down a dirt road.

C.    *The Police Investigation.*

On January 31, 2006, the police interviewed Mayberry's wife and son. His wife told them that, on the day Mayberry died, the last time she talked to him, he said he was with "Roland." His son told them that this Roland lived at 14402 Riverside.

On February 7, 2006, the police went to 14402 Riverside. This was the home of Rosalyn Y. Others who lived in the home included Roland Y., Rosalyn's adult son, and R.Y., Rosalyn's 12-year-old daughter.

Defendant was Rosalyn's stepson. He had lived with Rosalyn off and on since he was 11. At the time, he and his four-year-old son were living with Rosalyn again, having left New York a month or two earlier.

According to R., she and defendant were half-siblings, with the same father but different mothers. She and Roland were also half-siblings, with the same mother (i.e., Rosalyn) but different fathers.[1]

In a safe, the police found a nine-millimeter semiautomatic handgun. Tests showed that this gun fired the bullet found in Mayberry's neck and the bullet casing found in Mayberry's car.

---

[1]    This would mean that defendant and Roland were not biologically related at all.

In the kitchen, the police found a shoeprint similar to one found at the cinder block wall.

Defendant was at the house when the police arrived. That same day, however, he left and went to Florida, leaving behind his son and all of his "things." About a month later, his son's mother came and got the boy. More than two and a half years after the shooting, defendant was arrested in Florida.

D.      *Testimony of R.Y.*

R. testified that Mayberry had come to the house a couple of times to see defendant and Roland. One time, Mayberry hugged her and touched her "butt." When he left, he told her to "stay sweet." She felt "violated."

A few days later, when Mayberry was at the house again, defendant asked R. if she wanted Mayberry to apologize. She said she did. Mayberry said he was sorry if she felt violated. Defendant and Mayberry continued to talk; defendant did not seem angry.

E.      *Testimony of Rosalyn Y.*

R. told both Roland and defendant what Mayberry had done to her. Roland then told Rosalyn.

Rosalyn worked as a cashier at a minimart at a gas station. On the night of the shooting, defendant came to the minimart. He held his hand in the shape of a gun, put his finger to his head, and said, "[I]t's done." She knew he was referring to Mayberry. She started crying; she kept saying, "[P]lease tell me [you] didn't do that[.]"

5

Rosalyn then went outside, where Roland was pumping gas, and said, "[P]lease tell me he didn't do that." Roland said, "Yeah, mama, he did . . . ."

Rosalyn testified that the gun in the safe belonged to her. About a month earlier, someone had "shot up . . . the house," so whenever she went to work, she gave the gun to Roland. Everyone in the house knew it was there, and everyone knew the combination to the safe, except defendant.

F. *Statements and Testimony of James Quintons*.

1. *Quintons's statements to the police*.

James Quintons and Roland were good friends. Quintons had met defendant once or twice.

On February 7, 2006, the police interviewed Quintons. He did not appear to be under the influence of drugs or alcohol.

Quintons admitted that he had been at the apartment complex. Initially, however, he claimed that he had left and was on his way home when he heard a shot.

The police told Quintons that they "had witnesses that were telling [them] that he was there." They brought in Roland, who told Quintons "it was okay to tell the truth." Roland added that Rosalyn had already told the police that both Roland and defendant were involved in the murder. Finally, the police told Quintons that they knew he was not the shooter, but "he was either a witness in the wrong place at the wrong time or he was a co-conspirator . . . ."

6

Quintons then said that he was just leaving the apartment complex when Mayberry offered him a ride home. Defendant was in the car with Mayberry. Quintons waited while Mayberry cleared out the back seat. Meanwhile, a fourth black male walked up to the car. The police believed this was Daveon Pearson (see part I.G, *post*), although Quintons denied knowing the man's name.

Just then, Quintons heard a shot inside the car. Mayberry screamed. Quintons and Pearson jumped the wall and fled. Defendant caught up with them and "told them that they weren't there."

### 2. *Quintons's testimony at trial*.

At trial, Quintons denied knowing anything about the shooting. He admitted going to the apartment complex "once or twice" to buy marijuana.

When the police interviewed him, Quintons testified, he was only 18 and "very intoxicated." He changed his story because the police accused him of lying; they said if he did not tell them what they wanted to hear, he would be prosecuted for murder.

### G. *Statements and Testimony of Daveon Pearson*.

### 1. *Pearson's statements to the police*.

Daveon Pearson lived across the street from the Y.s. He was friends with Roland. He also knew defendant, who had helped him out when he needed money.

When the police first interviewed Pearson, they told him "Roland . . . said [you were] there . . . ." Nevertheless, he denied being at the apartment complex or knowing anything about the shooting.

7

On February 22, 2006, the police interviewed Pearson again. This time, he said that he and Quintons went to the apartment complex to buy some marijuana. In a white car, he saw defendant and a man who he later learned was Mayberry. Mayberry was in the driver's seat, and defendant was in the passenger seat. At that point, Pearson had known defendant only for about a week.

As they were walking up to the car, Pearson heard a shot. Mayberry got out and ran. His shirt was "covered with blood." Pearson and Quintons jumped over a wall and ran.

About 30 or 45 seconds later, Pearson realized that defendant was running behind them. He slowed down and let defendant pass him, because he did not want to be involved. Defendant was wearing a white T-shirt "covered in blood." He had a handgun in his waistband. Defendant and Quintons wanted to stay together, but Pearson said, "I'm not walking with you" and went home.

About four hours later, defendant came to Pearson's home. He said, "I had to do it." Pearson replied, "I don't even wanna know . . . ."

2. *Pearson's testimony at trial*.

At trial, Pearson confirmed that he and Quintons went to the apartment complex to buy marijuana.

Pearson saw Mayberry and a second person in the white Lincoln, but he claimed he could not tell who the second person was. As he and Quintons were walking up to the car, there was a gunshot, so they ran and jumped over the wall. He saw Mayberry get out of the car and run; there was blood "[a]ll over him." Mayberry screamed "[S]orry" twice.

When defendant caught up with Pearson and Quintons, he was wearing a black (not white) t-shirt. There were "little wet spots" on it, but Pearson could not tell if they were blood.

About four hours later, defendant came to Pearson's house and was trying to tell him something, but he cut defendant off.

According to Pearson, his statement to the police was not accurate. He was scared, because the police told him "[he] could be a witness or [he] could be a suspect."

II

PROCEDURAL BACKGROUND

Defendant and Roland were charged jointly with murder. (Pen. Code, § 187, subd. (a).) As an enhancement, it was alleged that defendant intentionally and personally discharged a firearm, causing death. (Pen. Code, § 12022.53, subd. (d).) Roland's case was severed before trial.

A jury found defendant guilty of second degree murder. It also found the enhancement true. Defendant was sentenced to a total of 40 years to life in prison.

9

Defendant appealed.  We held that the trial court erred by failing to conduct a hearing on defendant's posttrial *Marsden* motion.[2]  (*People v. Hunter* (Aug. 12, 2010, E048348) (slip opn. at pp. 24-27).)  We reversed and remanded with directions to hold a hearing on the *Marsden* motion and then, if the *Marsden* motion was granted, to appoint new counsel to consider whether to file a motion for new trial.  (*Id*. at p. 27.)

On remand, the trial court did grant the *Marsden* motion.  It therefore relieved defendant's trial counsel (Clifton Peters) and appointed new counsel (Robert Ponce).

Ponce filed a motion for new trial based largely on ineffective assistance of counsel.  The trial court held an evidentiary hearing; the only witnesses were defendant and Peters.[3]  At the end of the hearing, the trial court denied the new trial motion.  Thus, it reinstated the judgment.

---

[2]    A *Marsden* motion is a motion to discharge appointed counsel, based on ineffective assistance, and to appoint new counsel.  (*People v. Marsden* (1970) 2 Cal.3d 118.)

[3]    Defendant had submitted a declaration in support of the motion; however, it was unsigned.  The prosecution objected to the declaration, not because it was unsigned, but because it was assertedly hearsay.  The trial court excluded the declaration.  Defendant does not claim that this was error.  Accordingly, we disregard defendant's declaration.

## THE TRIAL COURT PROPERLY FOUND NO

## INEFFFECTIVE ASSISTANCE OF COUNSEL

A.    *Additional Factual and Procedural Background.*

At the trial, Peters did not present an opening statement.

Peters attempted to introduce two confessions by Roland.  During a pretrial hearing, Roland had asked if he could say something.  He then volunteered, in open court, " . . . I would like to say on the record that I killed Kevin Mayberry."  Later, Roland had written a letter to defendant admitting that he shot Mayberry in the face, saying that he knew defendant had nothing to do with the shooting, and apologizing for getting defendant involved.

Peters argued that, although hearsay, Roland's confessions were within the exception for a declaration against interest.  (Evid. Code, § 1230.)  The trial court excluded Roland's confessions as insufficiently trustworthy.[4]

Peters also attempted to call Roland to testify at trial.  Roland, however, invoked his Fifth Amendment privilege.

During trial, the trial court asked defendant if he intended to testify.  It admonished him, "[T]his is the only chance you get to give testimony in the trial.  If it turns out that

---

[4]    Roland had told the police that he gave defendant the gun so he could shoot Mayberry, but defendant was the shooter.  If he had waived his Fifth Amendment privilege, or if his confessions had been introduced, he almost certainly would have been impeached with these statements.

something happens and you don't like the result, you can't change your mind later on. It's only your choice whether to testify or to remain silent." It added, " . . . Mr. Peters can't make the decision for you. It is only you that can make that decision[.]" Defendant said that he understood and that he was choosing not to testify.

Both Roland and defendant having invoked their right to remain silent, Peters did not call any defense witnesses.

In closing argument, Peters largely went witness-by-witness. He conceded that Mayberry was murdered: "Somebody killed Kevin Mayberry. We know that. That's not in dispute. The question is who killed him, and my response is we don't know."

Peters addressed Rosalyn's testimony by noting that defendant told her, "it's done, meaning he knew that the killing occurred, but it doesn't say . . . that he did the killing."

Peters also stated: "[Rosalyn] told you that she gave that gun to her son Roland Y. She specifically told you that she kept it in the safe. The only person that didn't have the combination to the safe was [defendant]. He didn't have the combination to the safe. He didn't have the free access to the gun. She never gave it to him. I believe her testimony was she gave it to her son Roland when she would go to work, but she never said that she ever gave that gun to [defendant]."

Peters argued that the police had pressured Quintons and Pearson into making the statements that incriminated defendant; he noted that they had retracted those statements on the stand. He also argued that Roland and Quintons had had time to concoct a false account: "Mr. [Y.] comes into the room, says go ahead, tell them the truth, but what's the

12

truth? Do we know? Do we know if Mr. [Y.] and Mr. Quintons ever discussed any potential story about this?"

Peters pointed out that none of the shoeprints had been matched to any particular shoes. He also pointed out that fingerprints had been lifted and DNA samples had been taken, but there was no evidence of any matches.

B.      *General Legal Principles.*

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) includes the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.

13

All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

As a general rule, we review an order granting or denying a motion for new trial under an abuse of discretion standard. (E.g., *People v. Hajek* (2014) 58 Cal.4th 1144, 1247-1248.) When a motion for new trial is based on ineffective assistance, it is clear that we review an order *granting* the motion under the abuse of discretion standard. (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209-212; *People v. Andrade* (2000) 79 Cal.App.4th 651, 659.) Defendant and the People suggest, however, that there is a split of authority as to the standard of review that applies to an order *denying* a motion for new trial based on ineffective assistance.

*People v. Wallin* (1981) 124 Cal.App.3d 479 [Second Dist., Div. Two] held that the abuse of discretion standard still applies: "The trial judge is the one best situated to determine the competency of defendant's trial counsel. Where, as here, defendant is represented by different counsel at the motion for a new trial and the issue is called to the trial court's attention, the trial judge's decision is especially entitled to great weight and we defer to his fact finding power. Absent a showing of clear and unmistakable abuse, we will not disturb his decision. [Citations.]" (*Id*. at p. 483.)

*People v. Taylor* (1984) 162 Cal.App.3d 720 [First Dist., Div. Three], however, held, that under these circumstances, review is a two-step process, with a different standard applicable to each step:

14

"In the first step, the trial court must find the relevant facts . . . . On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences. The trial court's factual findings, express or implied, will be upheld if they are supported by substantial evidence. [Citation.]

"In the second step of the process, the trial court will have decided whether, on the facts which it has found, the defendant was deprived of his right to adequate assistance of counsel, that is, whether the defendant has shown that ' . . . trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates . . . [and] that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense . . .' [citation], or ' . . . that his counsel failed to perform with reasonable competence and that it is reasonably probable a determination more favorable to the defendant would have resulted in the absence of counsel's failings. [Citations.]' [Citation.] . . .

"To the extent that these are questions of law, the appellate court is not bound by the substantial evidence rule, but has '"the ultimate responsibility . . . to measure the facts, as found by the trier, against the constitutional standard . . . ."' [Citation.] On that issue, in short, the appellate court exercises its independent judgment.' [Citations.]" (*People v. Taylor*, *supra*, 162 Cal.App.3d at pp. 724-725.)

15

In our view, the conflict between *Wallin* and *Taylor* is more apparent than real. As both cases indicated, we defer to the trial court's express or implied findings on matters of historical fact, as long as they are supported by substantial evidence. However, "[w]hether counsel's performance was deficient, and whether any deficiency prejudiced [defendant], are both mixed questions subject to independent review. [Citation.]" (*In re Hardy* (2007) 41 Cal.4th 977, 993-994.)

*Taylor* spelled out this two-level standard of review, but it is also implicit in *Wallin*'s seemingly one-level formulation — if the trial court applied an erroneous legal standard, that would constitute an abuse of discretion within the meaning of *Wallin*. (See *People v. Knoller* (2007) 41 Cal.4th 139, 156 ["[A]n abuse of discretion arises if the trial court based its decision on impermissible factors [citation] or on an incorrect legal standard [citations]."]; see also *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 ["We review the trial court's ruling for abuse of discretion and generally will not disturb it '"unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions."'" [Citation.]".)

Thus, we will apply *Taylor*'s two-level standard.

C.      *Failure to Assert That Roland Was the Shooter*.

Defendant contends that Peters rendered ineffective assistance by failing to show, through evidence and argument, that Roland could have been the shooter.

16

1.  *Additional factual and procedural background.*

    a.  *Defendant's testimony.*

At the hearing on the motion for new trial, defendant testified that he spoke to Peters twice before trial. The first time, they talked for a little more than an hour. The second time was right before trial; they spoke "in the back" for four or five minutes.

Every conversation they had during trial took place at counsel table.[5] Defendant could not talk to Peters "in the back" during trial because the courtroom deputies took defendant out and put him on the bus.

Defendant asked Peters to present evidence that Roland was the shooter and to argue this theory to the jury. Peters replied that he could not mention Roland because Roland's trial had been severed.

Defendant also wanted Peters to hold an in-court "lineup" with him, Roland, Quintons, and Pearson. His idea was to ask Abilez which of them fit Abilez's description of the smallest man (i.e., the shooter). Defendant expected this to show that he was bigger and taller than Roland, Quintons, and Pearson and bigger and taller than the shooter.

---

[5]  Defendant was partially impeached, however, by the trial transcript. Peters had stated to the trial court, in defendant's presence, "I went to visit defendant last night," and defendant had not contradicted him.

17

Peters just told defendant to be quiet because he could not hear the judge and the prosecutor. After that, the courtroom deputy gave defendant a pencil and paper. Defendant wrote Peters a note, but "he ignored that too."

Defendant also asked Peters to bring out the fact that a certain pair of K-Swiss shoes seized in the search of the Y. residence belonged to Roland, were found in Roland's room, and were not even defendant's shoe size. At the hearing on the new trial motion, however, defendant admitted that the prosecution had not presented any evidence regarding the K-Swiss shoes.

b. *Peters's testimony.*

At the hearing on the motion for new trial, Peters testified that he had been a practicing criminal defense attorney for over 23 years. He had tried seven murder cases, including defendant's.

Peters did not know how many times he met with defendant. His notes reflected only one meeting with defendant, about three weeks before trial, for a little over two hours, at the jail. However, Peters believed he met with defendant at the jail a second time.

Peters talked to defendant every time defendant came to court. They talked during breaks and recesses. However, he did not have any notes of these conversations.

Peters did not think it would have been helpful to argue that Roland was the shooter "[b]ecause nothing indicated Roland was the shooter." Roland had been charged

18

with murder based on his statement to the police that defendant was the shooter and that Roland was an aider and abettor.

Peters did not remember any specific discussions with defendant about Abilez. However, he thought it would have been "foolish" to do a lineup in court, because previously, Abilez had been unable to identify defendant. He felt it was sufficient that Abilez testified that the man who looked in the car was only five feet six inches tall.[6] According to police reports, Abilez had previously described this same man as six feet tall. Peters did not think it would be helpful to compare defendant's height to Roland's.

Peters testified that, during trial, defendant "was constantly interrupting." "[I]t distracted me numerous times during the trial. I had to ask him, please do not disrupt me. I'm trying to listen to the testimony of the witnesses."

Regarding the shoes, Peters explained that the police had seized a pair of size 11 K-Swiss shoes from the Y. residence. Roland claimed that defendant had been wearing them at the time of the shooting. However, Roland's statement had not come into evidence at trial. The police never linked the K-Swiss shoes (or any other shoes) to the shoeprints found at the crime scene. Thus, in Peters's opinion, the K-Swiss shoes were "irrelevant." Peters also explained that he did not want to do anything that would cause the police to determine defendant's shoe size or otherwise link him with any of the shoes.

---

[6] Peters was off slightly; Abilez actually testified that the man was five feet seven or eight inches tall.

Peters did not remember talking to defendant about the shoes. He added, however, "I can guess that we probably did."

        c.    *The trial court's ruling.*

The trial court ruled:

"Well, Mr. Ponce, I don't think it's malpractice not to be Robert Ponce . . . . I don't say that to be a smart aleck. . . .

"If it's malpractice per se to have not argued to the jury that the person who shot — well, let's take your example as you say in your papers, Mr. Peters says to the jury, we don't know who shot the victim. You would have said to the jury, we do know who shot the victim. It was Mr. [Y.].

"You wouldn't have argued there's lack of evidence in this case to convict someone. You would have argued there's abundant evidence, and it all points at Mr. [Y.], and, therefore, it exonerates my client.

"Do I think that's a bad strategy? No. Sounds good to me. Would the result have been different? I don't know. As I recall this case, there was pretty strong eyewitness testimony that your client was guilty."

It added: "Mr. Peters did not choose to approach this trial in the way that you would have, in the way that Mr. Hunter, apparently, now says that he thought was the appropriate way to do it . . . .

"I'll say if that's ineffective assistance of counsel per se, then this record is what this record is. I don't see that. I saw the way that Mr. Peters handled the trial. I didn't think it was ineffective. To the contrary, I thought he was effective.

"I think that it's easy to say that things were handled in a way that was mistaken or wrong, especially when the jury convicts your client. If I were convicted by a jury, I would be blaming my attorney. You might just blame the facts that were presented in the case as well.

"Could there have been a different strategy taken? Yes. I'll go back to it, if that's ineffective assistance of counsel because Mr. Peters did not choose the arguments and the strategy that you ably have suggested should have been chosen, then they can — somebody besides me can make that determination, but I don't find that ineffective assistance of counsel per se."

Regarding defendant's lineup suggestion, the trial court stated: "What result would there have been from calling for an in-court lineup? Do we know? Would I have allowed it? Would there have been a different surprising result?

"I believe . . . that when you try something that you haven't an idea of what's going to happen, sometimes you win, sometimes they get worse. So this might have backfired. I don't know what would have happened."

The trial court found that defendant had, in fact, interrupted Peters repeatedly: " . . . I've never seen someone so distracting to an attorney in 16-and-a-half years . . . as a trial [j]udge. Mr. Hunter was constantly in the ear of Mr. Peters. . . . [I]t was pretty much

21

constant." The courtroom deputy had "made it a point to get a pencil and paper and put it in front of Mr. Hunter, so that Mr. Hunter could write things down and stop talking in Mr. Peters' ear."

Regarding the shoes, the trial court stated: "I don't know what size the shoes were. I don't know what size Mr. Hunter's feet are. I'm now envisioning this great idea in front of the jury. We have Mr. Hunter struggle to put his size 13 feet into a size eight shoe, and Mr. Peters be able to argue, if the shoe doesn't fit, you must acquit. That didn't happen.

"Is that ineffective assistance of counsel? Do I know what would have happened with those shoes? Do I know what those shoes meant when — again, in this case, the police basically had nothing with those shoes other than to show that somebody had jumped over a fence."

2.      *Analysis.*

Preliminarily, defendant argues that the trial court applied an erroneous legal standard, in several respects.

First, defendant cites the trial court's comment that it was not "malpractice" for Peters to have a different strategy than Ponce. Defendant notes that malpractice by a criminal defense attorney has two elements that ineffective assistance by a criminal defense attorney does not: (1) actual innocence and (2) postconviction relief from any conviction. (See *Khodayari v. Mashburn* (2011) 200 Cal.App.4th 1184, 1189.) The trial court, however, was not using the word malpractice in this technical sense. After all, it

22

was not rejecting defendant's ineffective assistance claim *because* he could not show actual innocence. Rather, it was using malpractice as a vivid shorthand term for ineffective assistance.

Second, defendant points to the trial court's repeated references to "ineffective assistance of counsel per se." He cites *In re Lucas* (2004) 33 Cal.4th 682, in which the Supreme Court stated that "failure to investigate and present all reasonably available mitigating evidence" does not constitute "ineffective assistance of counsel per se," but rather must be analyzed on a "case-by-case" basis. (*Id*. at p. 729, fn. 6.) Again, however, by using the words "per se," the trial court was not refusing to look at the facts of this particular case. It was simply saying that the facts that defendant had, in fact, shown fell short of proving ineffective assistance.

Turning to the merits of defendant's claim, it is simply not true that Peters failed to show that Roland could have been the shooter. There was evidence that pointed to Roland. R. told both defendant and Roland that Mayberry had touched her inappropriately. Mayberry had apologized to defendant, but there was no evidence that Roland was present or even knew about the apology. Rosalyn testified that Roland had the combination to the safe in which the gun was kept, but defendant did not. When Mayberry's wife talked to her husband on the day he died, he was with Roland. Admittedly, Rosalyn, Pearson, and Quintons all implicated defendant, but they were arguably biased. Pearson and Quintons were friends with Roland but had met defendant

23

only recently.  Similarly, Roland was Rosalyn's biological child, but defendant was only her stepson.

Peters also pointed the finger at Roland in closing argument.  Defendant focuses on Peters's statement "we don't know [who killed Kevin Mayberry]."  Nevertheless, Peters did note that Roland had access to the gun and defendant did not.  He argued that Roland may have schemed with Quintons to implicate defendant.  Moreover, he noted that R. told Roland, as well as defendant, about what Mayberry had done.

Defendant also focuses on Peters's testimony that "nothing indicated Roland was the shooter."  Technically, however, this was true.  The evidence we have discussed above was consistent with Roland being the shooter; however, it was also consistent with the scenario that Roland outlined in his out-of-court statements to the police, namely, that he furnished the gun, but defendant was the shooter.  There was really no evidence that Roland was *not* an aider and abettor.  Our point is that Peters did not let this stop him from implicating Roland.

Defendant argues that Peters could have introduced additional evidence pointing to Roland.  He claims that Peters should have cross-examined R. about whether Roland was present when Mayberry apologized, and if so, how Roland reacted.  However, R. was asked on direct if anyone else was present, and she said she did not remember.

Defendant also claims that Peters should have introduced evidence that, shortly before the shooting, Mayberry and Roland left the Y. residence together, whereas defendant stayed home.  The record, however, does not show that this actually occurred,

24

or if it did, that there was any witness available to testify to it. At the hearing on the new trial motion, defendant indicated that he could have testified to this; however, defendant chose not to testify. Defendant also argued that R. could have testified to this. However, he did not introduce any evidence to support this argument.

Next, defendant claims that Peters should have shown that the K-Swiss shoes were Roland's and not his. However, the K-Swiss shoes were not incriminating. There was no evidence that they matched any of the shoeprints found at the scene or in the Y. residence. The shoes did not have soil from the scene. They were not blood-spattered. They were just a pair of shoes that the police happened to find in the Y. residence. Thus, it was irrelevant whose shoes (or whose shoe size) they were.

Defendant also claims that Peters should have held an in-court lineup. The failure to do so was not ineffective assistance, because defendant could not show what testimony Abilez would have given. For all we know, Abilez might have identified defendant for the first time, as Peters feared. Defendant therefore argues, alternatively, that Peters rendered ineffective assistance by failing to interview Abilez before trial. This argument fares no better, however, because defendant still cannot show what Abilez would have said.

But even though defendant's lineup suggestion was not well-taken, defendant does have a point — Peters did not capitalize on the fact that defendant did not match Abilez's description of the smallest man. Defendant was not a lawyer, and could not be expected to know exactly how Peters should have done this. Defendant now suggests that Peters

25

could have asked Rosalyn or R. about Roland and defendant's respective heights and weights. Peters also could have asked Quintons and Pearson to state their height and weight for the record.

Even assuming this minor lapse was objectively unreasonable, it was not prejudicial. While there was no testimony about heights and weights, the jurors were able to observe defendant, Quintons, and Pearson and to come to their own conclusions about whether they fit Abilez's description. The only thing missing was Roland's height and weight. Precisely because these are not in the record, however, we have no way of knowing if Roland fit Abilez's description.

We also note that the evidence against defendant, if not absolutely conclusive, was quite strong. Two eyewitnesses identified defendant as the shooter. The gun used in the shooting was found in a safe in defendant's home. Defendant knew the gun was kept there. Defendant had a motive for the shooting. Defendant's own stepmother testified that she begged defendant to deny shooting Mayberry, but he did not[7]

Most incriminating of all, immediately after the police searched the house, defendant decamped to Florida, leaving behind his belongings as well as his four-year-old son. This was strong evidence of consciousness of guilt; certainly defendant never gave any other explanation for it. Roland, by contrast, remained in the area; he even assisted the police by urging Quintons to tell the truth.

---

[7]     In our previous opinion, we held that defendant's silence constituted an adoptive admission. (*People v. Hunter*, *supra*, slip opn. at pp. 17-19.)

We therefore conclude that defendant cannot show that, even if Peters had done everything defendant now claims he should have done to cast suspicion onto Roland, defendant would have enjoyed a more favorable outcome.

D.     *Failure to Call Rigoberto as an Alibi Witness.*

Defendant contends that Peters rendered ineffective assistance by failing to call Rigoberto Y. as an alibi witness.

1.     *Additional factual and procedural background.*

a.     *Defendant's testimony.*

At the hearing on the new trial motion, defendant testified that he asked Peters to call Rigoberto Y. as a witness; he explained that he was playing basketball with Rigoberto when the shooting occurred.  Peters said he was not going to call Rigoberto because he was calling Roland.  Later, however, Roland took the Fifth.  (See part III.A., *ante*.)

b.     *Peters's testimony.*

Peters agreed that defendant wanted him to call Rigoberto as an alibi witness.  He had a "distinct recollection" that he and defendant "mutually agreed" not to call Rigoberto because "there was some negative aspect of calling him."  However, he did not remember what that negative aspect was.

c.     *The trial court's ruling.*

In its ruling, the trial court did not expressly address the failure to call Rigoberto.  Earlier, however, during the argument on the motion, it observed, "We don't have Rigoberto.  We don't know what Rigoberto would testify to."

27

2.    *Analysis.*

We may assume, without deciding, that defendant proved it was objectively unreasonable not to call Rigoberto (or, at least, not to investigate the possibility of calling Rigoberto).

Even if so, defendant failed to show prejudice because he failed to prove that Rigoberto would, in fact, have given favorable alibi testimony. Admittedly, defendant testified himself that Rigoberto could give him an alibi. Nevertheless, Rigoberto did not testify at the hearing on the new trial motion. The trial court could reasonably find insufficient evidence that Rigoberto would actually support defendant's alibi. We also note that there was absolutely no evidence that Rigoberto was available to testify at defendant's trial in 2009.

E.    *Advising Defendant Not to Testify.*

Defendant contends that Peters rendered ineffective assistance by advising him not to testify.

1.    *Additional factual and procedural background.*

a.    *Defendant's testimony.*

According to defendant, Peters told him before trial that he should not testify. After hearing the prosecution witnesses, defendant told Peters that he wanted to testify. Specifically, defendant wanted to testify that: (1) he was innocent; (2) he was playing basketball with Rigoberto; (3) he did not have access to the gun; (4) the K-Swiss shoes

28

did not belong to him; and (5) he was taller than Roland, Quintons, and Pearson. He also wanted to deny Rosalyn's testimony that he made an incriminating gesture and statement.

Peters told him, "Don't take the stand. The DA is going to chew you up." He added, "They have no evidence against you. Don't worry about it."

Defendant conceded that he had been advised that he had the right to testify. He explained that he had waived this right because he was relying on Peters's advice.

b.   *Peters's testimony*.

Peters "speculate[d]" that he talked to defendant "at least half a dozen" times about whether he should testify. "I did not forbid [defendant] from testifying, and I don't think I discouraged him from testifying."

According to Peters, he told defendant that he had a right to testify. However, he also told him, "[I]f you take the stand, . . . you are going to be cross-examined by a seasoned prosecutor, a very good prosecutor, . . . and she will have a lot of latitude in asking you anything and everything about your participation . . . ."

c.   *The trial court's ruling*.

The trial court stated: "I think Mr. Hunter was advised very clearly that it was his right [to testify] . . . . The transcript makes it clear that Mr. Hunter was well informed that it was his decision to make." " . . . I don't believe for a minute that Mr. Peters was ineffective on the issue of whether or not Mr. Hunter didn't give testimony. I myself advised Mr. Hunter that he had the right to give testimony."

29

## 2.    *Analysis.*

The trial court found that Peters told defendant that he had the right to testify.  This finding was supported by substantial evidence.  It could also properly believe Peters's testimony that he did not try to discourage defendant from testifying, which contradicted defendant's claim that Peters affirmatively advised him not to testify.

Defendant therefore shifts his ground somewhat; he argues that "[Peters] did not spend sufficient time with [defendant] to evaluate the value of the testimony [defendant] had to offer . . . ."  During the trial, however, when defendant exercised his right to remain silent, Peters told the trial court "[W]e have spoken about it, I think, very adequately.  I went to visit with Mr. Hunter last night.  We discussed it . . . fairly thoroughly last night.  It's not something that's just been done without our discussing it."  Defendant was present, but he did not dispute this.

Moreover, Peters was well aware of what defendant could testify to.  He knew defendant was claiming that he was innocent.  He also knew defendant was claiming he had an alibi.  Presumably, then, defendant would contradict Rosalyn's testimony that he had admitted guilt.  Roslyn testified that defendant did not have access to the gun, so Peters knew that defendant could testify to this, too.  He knew that defendant at least wanted to show that the K-Swiss shoes did not belong to him and that he was taller than Roland, Quintons, and Pearson.  Defendant cannot show that a more in-depth interview would have revealed any additional exculpatory testimony.

30

According to Peters, he warned defendant that he was going to be cross-examined by a seasoned prosecutor who would have lots of latitude. According to defendant, Peters told him, more graphically, "The DA is going to chew you up." Defendant did not rebut the presumption that this was sound tactical advice. Ultimately, when defendant did testify at the hearing on the new trial motion, he was not a good witness; from time to time, he was rambling, incoherent, and confused. Thus, even assuming defendant was innocent, it was not objectively unreasonable for Peters to suggest that he should not testify.

Finally, defendant also argues that Peters was ineffective because he failed to prepare him to testify. Defendant and Peters agreed, however, that defendant should not testify; thus, there was no need to prepare defendant.

F.    *Failure to Introduce Exculpatory Evidence*.

For the sake of completeness, we note that in the trial court, defendant claimed that Peters rendered ineffective assistance by failing to introduce certain items of exculpatory evidence — i.e., evidence tending to show that defendant was not the shooter, but not pointing to Roland (or anyone else in particular).

Specifically, defendant wanted Peters to introduce:

1. Evidence that defendant's fingerprints were not found in Mayberry's car or on the gun.

2. Evidence that the pants that defendant had supposedly been wearing on the day of the shooting did not have any blood or gunshot residue.

31

3.  Evidence tending to impeach Rosalyn's testimony about defendant's incriminating gesture and statement.

In a factual section of his brief, defendant mentions Peters's failure to introduce this evidence.  In the argument section of his brief, however, he never actually claims that Peters's failure to introduce this evidence constituted ineffective assistance.

"'[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.  [Citations.]'  [Citations.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)  We therefore deem defendant to have forfeited any contention that the failure to introduce any of these items of exculpatory evidence constituted ineffective assistance.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
                                                                                                      J.

We concur:

RAMIREZ _____
                        P. J.

HOLLENHORST _____
                        J.