Filed 12/29/15  P. v. Oseguera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ARMANDO OSEGUERA,<br><br>    Defendant and Appellant. | F067522<br><br>(Super. Ct. No. CRM009323)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Quin Denvir for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Armando Oseguera was charged with assault resulting in the death of a child under the age of eight (Pen. Code, § 273ab[1] [count 1]), felony child abuse (§ 273a, subd. (a) [count 2]), and willful infliction of corporal injury upon a cohabitant (§ 273.5, subd. (a) [count 3]).  In connection with count 2, the information alleged he personally inflicted great bodily injury upon a child under the age of five in the commission of a felony.  (§ 12022.7, subd. (d).)  Following trial, the jury found defendant guilty as charged on counts 1 and 2 and convicted him of the lesser included offense of battery (§ 243, subd. (e)(1)) on count 3.  It also found true the special allegation on count 2.

Defendant subsequently filed a motion for a new trial on the grounds of ineffective assistance of counsel.  He claimed, inter alia, his trial attorney should have moved to suppress various post-polygraph statements to law enforcement because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  After a hearing on the matter, the trial court denied the motion.  Defendant was sentenced to 25 years to life on count 1 and one year on count 3, to be served consecutively.  He received 1,266 days of presentence custody credit.[2]

On appeal, defendant once again contends his trial attorney's failure to file a suppression motion constituted ineffective assistance of counsel.[3]  He does not contest

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2]     The trial court struck punishment on count 2 because the offense underlying count 2 "is a lesser and necessarily included crime" of the offense underlying count 1. The court also pointed out the determinate sentence on count 3 "ha[d] been completed."

[3]     Alternatively, defendant asks us to directly address his *Miranda* claims outside the context of the ineffective-assistance-of-counsel claim.  We cannot do this because no proper objection was raised below.  "The general rule is that a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal." (*People v. Milner* (1988) 45 Cal.3d 227, 236.)  "[U]nless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal …." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194.)

2.

his conviction on count 3. For the reasons set forth in this opinion, we reverse the trial court's ruling denying defendant's new trial motion and the judgment on counts 1 and 2.

<u>STATEMENT OF FACTS</u>

I.      **Prosecution evidence.**

Jennifer Karroll lived with her infant son Landon Skinner[4] in an apartment in Atwater. In February 2007, she started dating defendant. Shortly thereafter, he moved in.

Karroll worked a rotating shift schedule for a cheese manufacturer in Hilmar. Normally, her parents—who resided in Atwater—babysat Landon[5] while she was on duty. Although defendant was unemployed, he babysat the child only two or three times. On one such occasion in April 2007, defendant phoned Karroll and told her Landon fell off the bathroom counter. She came home and observed bruises on her son's face that resembled a handprint. Karroll never witnessed defendant hurting or reacting violently toward Landon, but did see the pair "wrestling" and "roughhousing."[6] In addition, beginning in March or April 2007, Landon seemed to be afraid of defendant and "didn't really seem like he wanted to be around him."

Karroll kept in touch with Darin Skinner—Landon's biological father—to preserve the paternal bond, which upset defendant. On July 19, 2007, the day before Karroll's birthday, Darin visited the apartment. The following night, defendant and Karroll argued and defendant shoved her.[7]

---

**4**      Landon was born on March 28, 2006. (See fn. 5, *post*.)

**5**      To avoid confusion, we identify individuals who share the same surname by their first names. No disrespect is intended.

**6**      Karroll testified defendant would "lay on Landon a little bit," but the horseplay escalated to the point she became "scared" and "told him to stop it."

**7**      At trial, Karroll recounted various altercations with defendant. On April 16, 2010, he struck her face at least twice and destroyed her cellular phone. On another occasion, defendant "slammed [Karroll's head] against the floor three times."

3.

On the night of July 22, 2007, defendant, Karroll, and Landon ate dinner with Karroll's parents at a restaurant in Merced. Afterward, they briefly stopped at Karroll's parents' house before going back to the apartment. That night, Landon acted "like a regular little one-and-a-half-year-old" boy. He was "[h]appy," "[o]utgoing," and "[f]un." The next morning, however, Landon vomited twice. Karroll, who had a lunch engagement with her father and had originally planned to bring Landon, decided to leave her son in defendant's care. When she returned an hour later, she saw a pallid Landon lying lethargically in his playpen. Defendant then left the apartment for "a couple of hours" "[t]o turn in some job applications." After he returned, he and Karroll moved Landon to the bedroom and watched a movie in the living room. Following the movie, Karroll checked on Landon and noticed he had vomited again. He was listless, sweaty, and "white as a ghost" and his stomach "felt hard." Landon could neither eat crackers nor drink fluids. At or around 10:00 p.m., Karroll phoned her mother and told her about Landon's condition. Meanwhile, defendant advised her to take the child to the hospital. Karroll's mother dropped by, examined her grandson, and instructed Karroll to call 911. Before the ambulance arrived, Landon stopped breathing.

Landon died at the hospital on July 24, 2007, at 1:45 a.m. Dr. Robert Lawrence, a contracted pathologist at the Merced County Coroner's Office, conducted an autopsy at 10:00 a.m. He found "severe abdominal injuries from blunt force trauma," namely a transected jejunum and a lacerated mesentery, and attributed Landon's death to the ensuing "shock and hemorrhage." Lawrence opined the "pattern of the injuries" "was consistent with inflicted trauma" "greater than … can [be] explain[ed] by any kind of a normal fall of a child around the house." For instance, "a child falling against … a corner of a crib" could not sustain such damage. Lawrence estimated the "blows to the abdomen" occurred "four to six hours before death, possibly longer." He ruled Landon's death a homicide.

In addition, Lawrence "could tell that there were some recent, but not fresh, [abdominal] injuries," observing "an inflammatory response where [Landon's] body was trying … to heal … and clear things up." Specifically, "there were … at least two other episodes of [nonfatal] trauma …." The first was "one to three days old" and the other was "at least a week or two" old and "could have been three or four weeks" old.

Subsequently, two other pathologists—Drs. Ann Bucholtz and Terri Haddix—reviewed Lawrence's report. Bucholtz agreed the cause of death was "blunt force trauma to the abdomen" and the "pattern of injuries" implicated homicide. Haddix opined Landon could have sustained his injuries up to 12 to 14 hours before his death, citing the degree of inflammation. She otherwise concurred with the findings.

Defendant was initially interviewed on July 24, 2007, by Detective Armando Echevarria of the Atwater Police Department. He told Echevarria "nothing at all had happened" the night before Landon's death and Landon had been "fine" the next morning. Defendant denied ever seeing him "fall[] out of the crib or drop[] or anything like that." In a second interview on August 23, 2007, Echevarria disclosed the results of Landon's autopsy. Defendant maintained nothing unusual occurred.

On April 27, 2010, Echevarria and Detective Alex Barba of the Merced County Sheriff's Department alternately interviewed defendant at the police station.[8] Barba inquired about Landon's fall in April 2007. Defendant detailed:

> "I had [Landon] … on the sink part, you know … [¶] … [¶] … 'cause I was taking off his clothes … [¶] … [¶] … [S]o I was taking off his clothes to give a bath and stuff … and, … usually we'll give him toys or anything like that …. [¶] … [¶] … [W]hen I turned around, he was already … going forward …. [H]e hit the ground, you know, I'm not gonna lie about that …. [¶] … [¶] … He did hit the ground and so I felt bad, so I picked him up, was like, hey you okay, you know …. [¶] … Are you alright dude and … you know … he seemed fine and so I was sitting right there and I put

---

[8] The jury either listened to audio-only recordings or watched video recordings of the interview segments admitted into evidence.

him … in the tub, that was it, you know, … he seemed fine, you know, he did hit his eye …. [¶] … [¶] … And I felt bad. You know, and I told [Karroll] right away when she got home, you know this happened, you know, and … she was like that's fine, you know, it's okay. You know, nothing happened."**9**

Barba challenged this narrative. Based on his experience as a criminal investigator in child abuse cases and photographs of Landon's bruises after the April 2007 incident, he suggested the infant "did not fall from that damn sink" but was slapped in the face instead. Defendant insisted he did know how Landon sustained the facial bruises.**10**

Echevarria asked whether "anything else … happened other than what [defendant previously stated]." Defendant presented a different version of what transpired the night of July 22, 2007:

"[T]hat night[,] I woke up. He was crying. I picked him up, came outside, … read to him, 'cause [Karroll] was sleeping still…. [¶] … [¶] … I took him in the room and everything. And I had his blanket and stuff, … he had a blue blanket. And … when I tried to move the blanket, and I tried to move, you know, because he had his bottle, too, and he was holding it, and so I tried to grab his arm, and he slid…. [¶] … [¶] … He fell … on the edge [of the crib]. But … he seemed fine…. I was, like, okay, 'cause he's still drinking his bottle. He … didn't really cry or anything, so that's all. I didn't hit him. I didn't hit him, you know. I didn't do anything like that. I haven't hit him. You know, but I didn't think nothin' was gonna happen. You know? [¶] … [¶]

"… [L]ike the next day when he was, you know, getting sick, I was just, like, okay. I thought it was 'cause it was somethin' else. [¶] … [¶] … I thought it was like a … fever or something. [¶] … [¶] … And that was it…. [A]fter … I seen him get worse, I told [Karroll], you know, take him to the hospital to find out what it is."**11**

---

**9** Defendant offered these statements before a polygraph examination. (See at p. 10, *post*.)

**10** This exchange between defendant and Barba occurred after a polygraph examination but before a *Miranda* warning. (See at pp. 10-11, 14-15, *post*.)

**11** Defendant offered these statements after a polygraph examination but before a *Miranda* warning. (See at pp. 10, 13, 14-15, *post*.)

Defendant later reiterated:

> "[H]e just fell on me, he just fell on me, man, he just fell on me. [¶] … [¶] … I remember I walked in, I was reaching him around, he turned on me, you know, 'cause I didn't have balance or anything and have a good grip on him. We went forward and he hit [the crib]. [¶] … [¶] … I was walking with him, right, and I had the blanket … in the arm and everything …. [¶] … [¶] … Okay, he was holding the bottle, and … I was walking over there, and when I was walkin', … trying to get the blanket, … when I was pulling it, you know, … I lost my grip and … he was falling, because I still had the blanket or whatever, and I pulled him … and he went forward, and that's when … [he] hit … the edge [of the crib]."[12]

## II. Defense evidence.

Defendant testified on his own behalf. Sometime in April 2007, he babysat Landon while Karroll was at work. He placed the infant on top of the bathroom counter to more easily remove his clothes in preparation for a bath. When defendant turned around to grab some bath toys, Landon fell.[13] Defendant immediately phoned Karroll and apprised her of what had happened. The following day, Landon had a bruise on his cheek.

On the night of July 22, 2007, defendant and Karroll put Landon to bed. Later that night, as Karroll continued to sleep, defendant heard the child "whining." He wrapped Landon in a blanket, brought him to the kitchen, gave him a bottle of milk, and headed back to the bedroom. Defendant recalled:

> "I remember the blanket was kind of dragging, so I went to grab it, and at the same time, I was already inside his room, and at the same time, when I went to grab it, he turned around on me, and for me not losing his grip, you know, I went forward, and that's when he hit the side of the crib. [¶] … [¶] … Almost towards the edge … of the crib. [¶] … [¶] … I remember it was towards his chest area. [¶] … [¶]

---

[12] Defendant offered these statements after a *Miranda* warning. (See at pp. 14-15, *post*.)

[13] Defendant testified Landon "hit the ground," but he also "caught [Landon] at the same time."

7.

"… He cried a little bit, you know, whined, and I was holding him to see if he was, once again, fine, and he didn't make any noises after that or anything like that, so I gave him his bottle, and he grabbed it, started drinking it so I thought he was fine, and I laid him down…. [H]e didn't do anything else after that."

Defendant did not tell Karroll about this incident because Landon "seemed fine." He did not tell Echevarria about this incident prior to the April 27, 2010, interview because it did not involve "someone hitting [Landon's]" midsection. Defendant denied deliberately harming the child.

On the morning of July 23, 2007, Landon appeared normal. Later, as defendant was "getting him ready," he vomited. Consequently, Karroll left Landon at home with defendant while she stepped out for approximately an hour. While she was gone, the child did not throw up. At some point after Karroll returned, defendant left the apartment for approximately two hours to submit job applications. Landon's condition progressively worsened throughout the day and into the evening. Defendant believed Landon had either a flu or a fever and was stunned by his death.

Eight character witnesses testified defendant was a truthful and nonviolent person. Regarding his interactions with children, they testified he was friendly, playful, gentle, and caring.

## DISCUSSION[14]

---

[14]    Defendant filed two separate applications for leave to file supplemental briefing regarding two new authorities—*People v. Morales* (July 14, 2015, D067411), review denied and opinion ordered not published October 28, 2015, S228782, and *Reyes v. Lewis* (9th Cir. 2015) 798 F.3d 815 [confession should be suppressed when police officers deliberately employ a two-step interrogation technique (question and get answers, then give warnings, then repeat the question to get answers already provided) and not take appropriate curative measures]—"should the Court find it helpful." Given our disposition, we find supplemental briefing unnecessary.

8.

## I. Defendant's new trial motion should have been granted.

### a. *Background.*

#### i. The April 27, 2010, polygraph examinations and interviews.

After reviewing Bucholtz's and Haddix's opinions (*ante*, at p. 5), Echevarria wanted polygraph examinations performed on defendant and Karroll. On the morning of April 27, 2010, Karroll visited the police station, where she consented to and underwent testing. When asked whether she believed someone had been involved in Landon's death, she replied in the affirmative and identified defendant. Barba, the examiner, concluded Karroll was not culpable. Upon Echevarria's request, Karroll waited in the lobby.

Around 1:00 p.m., Echevarria and Detective Adolfo Lomeli met defendant at his and Karroll's apartment in Merced. They asked him to accompany them to the police station for another interview on the subject of Landon's death. Defendant "immediately agreed" and expressed his "willing[ness] to do anything or speak with anyone in order to resolve the matter." He inquired about Karroll's whereabouts and learned she was still at the station and would remain there in the event a follow-up interview with her was necessary. Upon arrival, Echevarria informed defendant about "new developments as to what caused [Landon]'s death" and asked him to undergo a polygraph examination. Defendant "immediately stated that he would."

At 1:58 p.m., defendant entered a small examination room and sat in a corner behind a table. Barba joined him shortly thereafter. The detective spoke about his background as a criminal investigator in child abuse cases and a polygraph examiner. While he acknowledged "nothing's 100 percent," Barba asserted the accuracy of a lie detector test "[i]s in the high 90's." He told defendant:

> "[B]y the time that we get done I … will guarantee you that … you and I are gonna know what happened. You and I are gonna know whether you did this or whether somebody else did it, you know?"

9.

Barba asked about Landon's fall in April 2007 and defendant gave his account. (*Ante*, at pp. 5-6.) Next, Barba presented a consent form, which read, inter alia:

> "I do hereby voluntarily, without duress, coercion, promise of reward or immunity, submit to a polygraph ('lie detector') examination, having had said technique explained to my satisfaction ….

> "It has been explained to me that anything I say during this examination, including the pre-test interview and post-test interview, except that which is mandated as reportable by peace officers, is confidential and will not be released to anyone without my knowledge and consent."

Defendant signed the form.

At 2:22 p.m., Barba attached the machine's sensors to defendant's body. Following calibration, the polygraph examination commenced and lasted for roughly 30 minutes. When asked multiple times whether he injured Landon and caused his death in July 2007, defendant consistently replied, "No." At 2:54 p.m., Barba left the room and informed Echevarria defendant had failed the test. Echevarria instructed Barba to question defendant further.

At 2:56 p.m., Barba returned to the examination room, sat beside defendant, and placed his feet on the table.[15] He remarked:

> "You … caused the injuries … to this kid…. Okay? … I have no doubts that that's what happened, … and the only question that I have [for] you is why and how it happened. Let me tell you something right now. Let me tell you everything that we know, as of right now, okay? I know … that you used to … play … rough with him …. [¶] … [¶] … You used to wrestle with him. Okay, he's a … little guy. You're a big dude. [¶] … [¶] … Listen to me. Look at me, when I talk to you, okay …."

Next, Barba explained the results of defendant's polygraph examination:

> "I compare[d] these questions, which is, in July of 2007[, 'D]id you injure Landon, causing his death,['] okay? I compare … your answers … to an answer that I don't care about…. Well … the innocent person is not gonna react to ['D]id you cause the injuries to Landon['] …. [¶] … [¶] … Okay?

---

[15] The video footage showed defendant was boxed in by Barba and the table.

There's just no way.  It just doesn't happen.  And … I gave you three tests … and on all three tests … you showed … deception….  [¶] … [¶] … [T]he probability of this is greater than 99 percent.  It cannot get any higher than this.  Okay?"

Barba challenged defendant's account of the April 2007 incident.  Defendant denied any wrongdoing.  (*Ante*, at p. 6.)

Barba revealed Karroll passed her polygraph examination.  He also disclosed new information "that [Landon's] … injuries were caused between Sunday night … and Monday."  Barba articulated:

"Now, something happened between Sunday night and Monday to where this little guy got injured.  There's no question about that.  You know, we're gonna be able to show that … a … medical professional … came up with these … opinions and these facts, and the baby was under your care ….  [¶] … [¶] … [S]omething did happen, because the kid's not gonna get injured just on its own ….  [¶] … [¶]  … And I'm telling you right now ….  [¶] … [¶]  … [t]hat I've done 400 to 500 of these polygraphs, and I have no doubts that this happened.  [¶] … [¶]  … [S]omething traumatic happened because of his injuries.  All right?…  [A]ccording to the medical person, either the baby was punched or kicked in the stomach ….  [¶] … [¶]

"… Something happened between you and him when you were taking care of the little guy.  There's just no doubt.  Okay?  Now, if you're gonna sit here and tell me that nothing happened, well, I'm not gonna accept that.  [¶] … [¶]  … And nobody in their right mind is gonna accept that, because a 15-[month]-old … kid, you know, doesn't die like that.  You know what I mean?  [¶] … [¶]  … All we can say is the machine's saying this, the medical examiner's saying this, he was under your care, and if that's how you wanna end it, and you wanna leave it like that, that's up to you.  I know that you know what happened.  I told you that before you took the polygraph that I would know and you would know after taking the polygraph.  I have no doubt …, I'd put my paycheck on this.  Okay?  But something happened."

Again, defendant denied any wrongdoing.

Barba left the room at 3:09 p.m.  A minute later, Echevarria entered, sat beside defendant, and resumed the interview.  The detective commented:

"The problem is this, okay?  Landon died.  All right?  And he didn't die a slow, peaceful death.  Okay?  He didn't just close his eyes and go to sleep.

11.

All right?  The death that he … suffered, or the death … that happened to him, he suffered.  All right?  And he, it wasn't something that, you know, it was just a … moment of pain or something like this.  This went on for several hours.  Okay?  And the reason why it took me so long to be able to come back and talk to you guys is because I needed to, to make certain of what my suspicio[n]s were, and what was going on.  All right?  And I was able to do that.  And I was able to get confirmation through a pathologist and … to review the records, review the autopsy, you know….  [Karroll] had her appointment with me at ten o'clock in the morning, and she's been here since right before I went to go pick you up.  And that interview … was very extensive; as well as the examination that she underwent.  All right?… [¶] … [¶] … [W]e're trying to figure out what happened.  Okay?  I know that [something] happened there at the house."

When defendant swore he "never touched [Landon]," Echevarria responded:

"Listen to me….  All right?  The cause of his death was … somebody striking him so hard that the inside of his gut, the inside of … his organs, struck the back of his spinal cord, and that's what severed the artery, and that's what made him bleed to death.  He bled to death.  Now, was this something that happened intentionally because you lost your temper?  [¶] … [¶]

"… For three years you've been living with this.…  [L]et's stop with you having to deal with this, and let's get it out, let's get it over with, and let's get the ability to be able to move on.  Not just for [Landon's] sake, but for your sake as well …, too.  That's a heavy burden that you have to carry with you.  [¶] … [¶] … Get that burden off your back, get that burden off your shoulders, and do the right thing, and tell me exactly what happened that day ….  [T]hat's the only way that we're gonna able to go ahead and move on.  Not just for him, not just for his parents, not just for his mother, but for yourself.  You gotta start thinking about it this way.  It's tough.  Okay, tell me what happened."

Defendant still denied injuring Landon.  Echevarria continued:

"Okay.  Something happened here.  All right?  The force that … this little boy suffered right there on his tummy, all right, was so severe ….  [¶] … [¶] … [h]is insides ruptured.  [¶] … [¶] … [W]as this an accident?  Or was this something that you just … intentionally went and did?  [¶] … [¶] … Or … is this … [the] result of an argument that … was going on?  Or the lack of sleep?  Or the frustration that, you know, you can't get a job?... You hadn't been able to get employment.…  [Y]ou're having to rely … on [Karroll].  I'm sure her parents probably think, oh, that guy's, you know,

nothing, but a deadbeat, you know, … and he's living off of her … skirt tails.  And that's what's been … going on here.  All right?…  [A]s a man, … that plays heavy on one….  [¶] … [¶]

"… [Y]ou took a polygraph examination on your own free will.  [¶] … [¶] … And … what that did ….  [i]s it went to … corroborate and to solidify … my suspicions.  All right?  Now, the problem … that we're [hav]ing here right now is:  … what actually happened that day or that night.  Okay?  Because I can recite for you word for word the last 72 hours of Landon's life; exactly what he did, what he ate, where he was at, and who he was with.  All right?  The medical report indicates that ….  [t]he injuries were within hours of his death.  [¶] … [¶]

"… I know that he was in your and [Karroll]'s care … between 9:00 and 9:30 p.m., Sunday, until 9:00 to 9:30 p.m., Monday.  When … the ambulance showed up, and when they took him to the hospital, he died before he even made it to the hospital.  He was with nobody else….  You're in a position right now … to be able to go ahead and get this burden off of you….  All right?  You can still put yourself in that position."

Finally, defendant offered a new account of what had transpired the night before Landon's death.  (*Ante*, at pp. 6-7.)  He admitted he "should have said something" earlier but was "scared."  Defendant maintained he never hit Landon.

When asked whether he wanted to speak with Karroll, defendant replied in the affirmative.  Echevarria exited the examination room at 3:39 p.m.  A minute later, Barba entered.  As he was detaching the sensors from defendant's body, he remarked, "[Y]ou know that something more traumatic had to have happened, right?  You know that, right?"  Defendant denied striking Landon.  Barba exited the room at 3:42 p.m.  Before he left, he advised defendant to "be honest with [Karroll]."

Approximately 10 minutes later, Echevarria and Barba escorted Karroll into the examination room.  After the detectives left the couple by themselves, Karroll asked defendant what had happened the night before Landon's death.  He answered:

"The last night, or whatever, when [we] went from your parents ….  You know?  Remember how we laid him down, and he had that … little bassinet thing where he [laid] and stuff, 'cause that's where he was playing at when we were bringing him out?  Um, later on that night …, he was crying or

13.

whatever.  Well, uh, remember how he used to whine for just a bottle?  And you were sleeping, and I went in there, and I got him out of the crib, and I took him in the kitchen to make him a bottle.  And when I went back, you know, I was telling them that he … fell right … on the edge of the crib.  Because, you know, I was … I didn't mean to.  I didn't … do it on purpose.  You know, you … I didn't mean to.  [¶] … [¶]

"… Honestly, I didn't think it was because of that.  And the reason why I didn't tell you is because I was afraid.  You know?"

When questioned about Landon's facial bruises following the April 2007 incident, defendant insisted he did not hit Landon.  Defendant did not make any new admissions.  As a result, Echevarria—who had been observing the conversation—returned to the room at 4:03 p.m.  Karroll left a minute later.

At 4:07 p.m., Echevarria informed defendant he was under arrest and asked him to undergo a second polygraph examination to validate his account of what had transpired the night of July 22, 2007.  Defendant replied, "Ah, I don't know what else to do …."  At 4:09 p.m., Echevarria recited the *Miranda* warning.[16]  The following exchange took place:

"ECHEVARRIA: …. Do you understand each of these rights I explained to you?

"[DEFENDANT]: Yes.  [¶] … [¶]

"ECHEVARRIA: Okay, having these rights in mind do you wish to continue to talk to me?

"[DEFENDANT]: Um, what else can I say?...

"ECHEVARRIA: Well, … it's just a yes or no question, … as far as you wanting to continue talking to me.  Do you want to continue talking with me, or not?

"[DEFENDANT]: Uh, I'd like you know, to talk to someone, you know?

"ECHEVARRIA: Okay.  [¶] … [¶]

---

**16**  In the video footage, Echevarria erroneously mentioned the time was 3:47 p.m.

"[DEFENDANT]: I'm just a little scared, you know?"

Questioning resumed at 4:11 p.m. after Echevarria gave defendant a bottle of water. Defendant reiterated his account of what had occurred on the night of July 22, 2007, and used a doll to mimic his actions that night.[17] (*Ante*, at p. 7.)

At or around 4:45 p.m., defendant began to hyperventilate. He then complained of nausea and numbness of the hands and arms. The interview was terminated and emergency medical services were summoned to the scene.

### ii. The new trial motion.

Defendant's post-trial attorney Jem Martin filed a motion for a new trial on February 22, 2013. The motion alleged, inter alia, defendant's trial attorney rendered ineffective assistance of counsel by not attempting to suppress defendant's post-polygraph statements.

At an April 15, 2013, motion hearing, defendant's trial attorney was called to the witness stand. Martin elicited the following testimony on direct and redirect examination:

"Q. I assume that you also felt like [defendant]'s statement to the police after the polygraph test was especially harmful to the defense?

"A. Yes, it was. That was the worst piece of evidence against him.

"Q. And what efforts did you make to exclude or attempt to exclude that evidence?

"A. Well, everything leading up to and after the polygraph, as far as I can tell, none of that really came in, but the statement, I believe, after the police informed him he failed the polygraph, I recall they read him his *Miranda* rights at that point. I might be mistaken, but that's what I recall, and then the statements that he did make were all made after he had been Mirandized.

---

[17] Throughout the post-*Miranda* interview, Barba intermittently entered the room, expressed skepticism with regard to defendant's account, and exited.

15.

"Q. But those exact same statements were made before he had been Mirandized as well?

"A. Maybe they were, but I'm just going by my recollection.

"Q. Okay. But it wouldn't surprise you if the police reports in this case indicate that the entire post-*Miranda* statement had been given to the police pre-*Miranda*?

"A. There was—I believe there was something to that effect, yeah.

"Q. Okay. And this—as you recall, this statement was in the police station; correct?

"A. Yes.

"Q. Okay. And … you didn't think there was any grounds for attempting to exclude that statement?

"A. Not at that point, no.

"Q. In hindsight do you think that there might have been?

"A. I would have to review the file in order to make that decision. That is something I would not overlook, and so it would be my practice to consider excluding statements for *Miranda* violations and to do motions to that effect if necessary. I did not in this case so there must have been a legal basis not to do it. There must have been case law that supported the prosecution, and that's why I chose not to do it. That would have been my custom and practice.

"Q. But you don't have a specific memory of that happening in this case?

"A. No.

"Q. It's just your custom and practice?

"A. Yes. [¶] … [¶]

"Q. … [I]n your opinion, he wasn't free to leave … when the police had found he was deceptive on the polygraph and came back to confront him with that; is that correct?

16.

"A.  I would agree with that, that at that point, the police were certainly not going to let him leave.  [¶] … [¶]

"Q.  Just briefly, … what are the two criteria for *Miranda* violation?  I mean, in-custody interrogation?

"A.  Yes.

"Q.  Okay.  You already testified that … in your opinion, [defendant] was in custody, wasn't free to leave; is that correct?

"A.  After the police told him he failed the polygraph, I believe at that point—well, whether or not he's in custody goes to the state of mind of the suspect.  It's not whether the police have him and believe he's in custody or not.

"Q.  Right.

"A.  And so—but at that point, the argument could be made that a reasonable person would feel that they were in custody, yes.

"Q.  Okay.  And you—I assume that you certainly believe that the police, armed with this information from the polygraph, were intending to and actually did interrogate [defendant]; correct?

"A.  Yes.

"Q.  All right.  So he's not free to leave and he's being interrogated by the police.  [¶]  Would you agree with that?

"A.  Yes.

"Q.  Okay.  So you didn't think that warranted a motion in limine or some sort of attack on that statement?

"A.  Again, I don't have all of the evidence—I don't have the file in front of me, all right?

"Q.  … [I]s it possible that's just one you missed?

"A.  It's possible." (Italics added.)

The deputy district attorney elicited the following testimony on cross-examination:

"Q.    What about your standard of practice in analyzing *Miranda* issues and the potential of excluding somebody's statement to the police? Could you just talk about your standard custom and practice[?]  [¶] … [¶]

"A.    Well, I'm aware of the case law with *Miranda*.  It's something I would like to keep up with and it's something I look at in every case that I read that's assigned to me that—where statements, admissions, are an issue, and determine if there is, in fact, grounds for … excluding the statement based on *Miranda* and how that would impact the defense.  [¶] And in this case, as I said, if I felt there was grounds to have statements— harmful statements excluded, I would have … made efforts to do so." (Italics added.)

On May 1, 2013, the court issued its ruling:

"I presided over the trial.  I've watched the trial, and I know that there is a wide range of what attorneys can do.  As an attorney for 30 years and watching attorneys as a judge, I know that there are many different levels of skill, and that's not the requirement.  It's not that [defendant] received the best representation that he could have received but that he received adequate representation that does not fall below the standard of care, and that at the end of the day he, essentially, received a fair trial, and that's what I'm focusing on.  [¶] … [¶]

"… In determining whether [defense counsel] failed to act in a manner expected of a reasonable attorney, … I have reviewed and considered the April 27th, 2010, videos of the polygraphs and interviews of … defendant and … Karroll; the written transcripts that were provided; the police supplemental report; the written authorities submitted by both parties; the testimony of [defense counsel] on April 17th, 2013….

"The law is clear that … defendant … has a burden of proving ineffective assistance of counsel here.  Defendant must show by a preponderance of the evidence that [defense counsel]'s representation fell below the objective standard of reasonableness and that [defense counsel]'s deficient performance, in fact, prejudiced … defendant.

"… From the evidentiary facts that have been presented to me, I find that … defendant received a fair trial and that … defendant has not established that [defense counsel] failed to act in a manner expected of a reasonably competent attorney or that he should have made a motion to suppress the incriminating statements.

"The record shows [defense counsel]'s reasons for not making these motions; that is, the facts [and] the law, in his opinion, did not support granting the motion and his trial strategy which required … defendant to testify.

"Even assuming a motion to suppress should have been made, … defendant has not proved that it's reasonably probable that a determination more favorable to [him] would have … resulted. [¶] In order to prevail on this motion, … defendant would need to show that the motion was reasonably probable to be granted and that an acquittal reasonably was probable to have occurred without the incriminating statements. [¶] … [¶]

"Based upon … factual findings,[18] my legal conclusion [is] that a competent attorney could reasonably conclude that a motion to suppress was without merit …. [T]he Court relies upon the authorities that state that the defendant was not in custody for purposes of *Miranda* rights after he was told he failed the polygraph test, specifically the case of *People v. Rich*[ (]1988[)] 45 Cal.3d 1036[, ]1077, in which the Supreme Court noted that a post-polygraph examination conducted at the police station is not 'tantamount to a custodial interrogation.'

"I also look at the totality of the circumstances … before [defendant] was told that he was formally arrested.… [T]he Court must look at the totality of the circumstances where there is no formal arrest and determine whether a reasonable person would feel he or she is not free to leave and

---

**18** The trial court made the following factual findings, inter alia: "defendant voluntarily submitted to a polygraph [examination]"; "defendant signed a written consent"; "defendant … had no difficulty understanding questions, responding or expressing himself during the interviews"; "no promises or threats were made to … defendant"; "at no time was … defendant physically restrained"; "[t]here were no handcuffs"; "at no time was there any show of force displayed by any officer"; "defendant never asked to terminate the discussion"; "defendant never stated he wanted to leave"; "defendant never attempted to leave"; "defendant's incriminating statement was voluntary"; "defendant agreed to meet with [Karroll] so he could explain and talk to her"; "[Karroll] and … defendant met alone in the interview room"; "[t]hereafter, Detective Echevarria advised … defendant he was under arrest, and the *Miranda* rights were read"; "defendant advised he understood his rights and that he would like to talk to someone because, 'I'm just a little scared'"; "defendant post-*Miranda* voluntarily continued to explain how the 'accident' occurred"; "defendant voluntarily demonstrated with a doll how the injury occurred"; and "no further questioning or interrogation or interviewing regarding the incident with Landon took place after [defendant's] severe episode of stress occurred." (Italics added.)

19.

cease questioning. The Court does not find that he was in custody under that standard as well …. Therefore, the motion is denied." (Underlining omitted & italics added.)

## II. Standard of review.

We review a trial court's ruling on a new trial motion for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

First, "'[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) "'Substantial evidence' means that evidence which, when viewed in light of the entire record, is of solid probative value, maintains its credibility[,] and inspires confidence that the ultimate fact it addresses has been justly determined." (*People v. Conner* (1983) 34 Cal.3d 141, 149.)

Second, a trial court's discretion "'must be exercised within the confines of the applicable legal principles.'" (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1218; accord, *People v. Beaty* (2010) 181 Cal.App.4th 644, 652.) In other words, "[t]he trial court does not have discretion to depart from legal standards." (*People v. Neely* (1999) 70 Cal.App.4th 767, 776.)

Finally, "'"[a] trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."' [Citations.]" (*People v. Thompson*, *supra*, 49 Cal.4th at p. 140.) "Although this standard of review is deferential, 'it is not empty …. [I]t asks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.]" (*People*

20.

*v. Andrade* (2000) 79 Cal.App.4th 651, 659 (*Andrade*); see *People v. Tran*, *supra*, 215 Cal.App.4th at p. 1218 ["'"'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion."'"].)  "The appellant has the burden to demonstrate that the trial court's decision was 'irrational or arbitrary,' or that it was not "'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." [Citation.]'  [Citations.]" (*Andrade*, *supra*, at p. 659.)

## III.  Analysis.

"A new trial may be granted where the trial court finds that the defendant received ineffective assistance of counsel." (*Andrade*, *supra,* 79 Cal.App.4th at p. 659.)  "To prevail on this ground, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" (*Id.* at pp. 659-660, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686; see *People v. Wharton* (1991) 53 Cal.3d 522, 575 ["Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"].)

After considering defendant's trial attorney's testimony at the April 15, 2013, motion hearing, the video footage of the April 27, 2010, polygraph examinations and interviews, and pertinent transcripts and police reports, the trial court concluded the trial attorney's decision not to move to suppress defendant's post-polygraph statements was rational.  Notably, the court found defendant was "not in custody for purposes of *Miranda*" at the time.

21.

By contrast, we believe the totality of the circumstances clearly established defendant was in police custody during the post-polygraph, pre-*Miranda* interview. "*Miranda* … and its progeny protect the [Fifth Amendment's] privilege against self-incrimination by precluding suspects from being subjected to custodial interrogation unless and until they have knowingly and voluntarily waived their rights to remain silent, to have an attorney present, and, if indigent, to have counsel appointed." (*People v. Gamache* (2010) 48 Cal.4th 347, 384.) "'In applying *Miranda* … one normally begins by asking whether custodial interrogation has taken place.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "'Absent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*Ibid.*)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 394-395.) "Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest." (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.) "'[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.' [Citation.]" (*Ibid.*) "The totality of the circumstances surrounding an incident must be considered as a whole" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403), including "[(1)] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; [(2)] whether the express purpose of the interview was to question the person as a witness or a suspect; [(3)] where the interview took place; [(4)] whether police informed the person that he or she was under arrest or in custody; [(5)] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; [(6)] whether

22.

there were restrictions on the person's freedom of movement during the interview; [(7)] how long the interrogation lasted; [(8)] how many police officers participated; [(9)] whether they dominated and controlled the course of the interrogation; [(10)] whether they manifested a belief that the person was culpable and they had evidence to prove it; [(11)] whether the police were aggressive, confrontational, and/or accusatory; [(12)] whether the police used interrogation techniques to pressure the suspect; and [(13)] whether the person was arrested at the end of the interrogation" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*)). "[N]o one factor is controlling …." (*People v. Pilster*, *supra*, at p. 1403.) "Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, at p. 1162.)

Here, we reviewed the video footage of the April 27, 2010, polygraph examinations and interviews and observed multiple indicia of custodial interrogation after defendant completed and failed the polygraph examination. (See *People v. Linton*, *supra*, 56 Cal.4th at p. 1177 ["The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."].) Barba, who was instructed by Echevarria to continue questioning defendant, did not recite the *Miranda* warning. Instead, he sat beside defendant and propped his feet on the table. Given where the men were seated and where the table was situated, defendant was cornered. In addition, he was still connected to the polygraph machine. Once in position, Barba—in a confrontational tone—revealed the results of the lie detector test and persistently accused defendant of causing Landon's death. He commented on the "greater than 99 percent" accuracy of the polygraph examination; his experience administering "400 to 500" such tests; autopsy findings confirming trauma-induced abdominal injuries; accompanying medical opinion deducing these injuries were inflicted sometime between the night of July 22, 2007, and July 23, 2007; and the fact

23.

Landon had been under defendant's care during this period. When defendant denied any wrongdoing, Barba asserted he knew what actually happened and was "not gonna accept that."

Approximately 15 minutes later, Echevarria swapped places with Barba and continued the interrogation. He did not recite the *Miranda* warning. Speaking in a tone that was less antagonistic than Barba's, Echevarria graphically described the autopsy findings, discussed defendant's and Karroll's respective test results, and highlighted the fact Landon was under defendant's care and "nobody else['s]" between the night of July 22, 2007, and July 23, 2007. He speculated defendant could have injured Landon due to domestic troubles with Karroll and her parents or the frustration of being unemployed. Echevarria also appealed to defendant's conscience: he advised him to "do the right thing," divulge "exactly what happened that day," and "[g]et that burden off [his] back." Ultimately, defendant succumbed to the detectives' interrogation techniques and offered a new account of what had transpired the night before Landon's death. In our view, the "interplay and combined effect of all the circumstances … created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Hence, a *Miranda* advisement should have been given.

The Attorney General argues defendant's subsequent "spontaneous" remarks to Karroll would offset any error in admitting his post-polygraph, pre-*Miranda* statements. (See *ante*, at pp. 13-14.) We beg to differ. "Interrogation includes both express questioning and 'words or actions … the police should know are reasonably likely to elicit an incriminating response from the suspect.' [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 752.) "Interrogation thus refers to questioning initiated by the police or its functional equivalent" (*People v. Thornton* (2007) 41 Cal.4th 391, 432), the latter of which "involves police-initiated deceptive techniques designed to persuade or coerce a criminal defendant into making inculpatory statements" (*ibid.*). The record indicates the

24.

detectives used Karroll to elicit incriminatory responses from defendant: (1) even though Karroll passed the lie detector test, Echevarria asked her to stay at the police station until defendant completed his; (2) Echevarria offered defendant the opportunity to speak to Karroll; (3) Barba instructed defendant to "be honest with [Karroll]"; (4) Echevarria and Barba escorted Karroll into the examination room, left her with defendant, and observed the conversation while hidden from view; and (5) Echevarria only "interrupted the conversation and asked Karroll to leave the room" when defendant "did not make any further admissions …."

In view of Echevarria's and Barba's conduct, we also believe defendant's post-*Miranda* statements were inadmissible. "In midstream *Miranda* cases (where a defendant is interviewed before and after the giving of *Miranda* warnings), a defendant's postwarning inculpatory statements are generally admissible if the prewarning statements and the postwarning statements were voluntarily made." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1363-1364, italics omitted, citing *Oregon v. Elstad* (1985) 470 U.S. 298, 318.) On the other hand, "'a trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights…. [W]here law enforcement officers *deliberately* employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's shoes of his rights, the trial court should suppress the confession.'" (*People v. Rios* (2009) 179 Cal.App.4th 491, 504-505, quoting *U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157-1158 (*Williams*).)[19]

---

[19]    This "deliberate use" rule is taken from Justice Kennedy's concurrence in *Missouri v. Seibert* (2004) 542 U.S. 600, 618-622 (*Seibert*). "When a fragmented [United States] Supreme Court issues an opinion which does not have the assent of five justices, generally, the controlling holding is that of those who concurred in the judgment on the

"[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence … support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." (*Williams*, *supra*, 435 F.3d at p. 1158, fn. omitted.) "Such objective evidence would include the timing, setting[,] and completeness of the prewarning interrogation, the continuity of police personnel[,] and the overlapping content of the pre- and postwarning statements." (*Id.* at p. 1159.)

"Once a law enforcement officer has detained a suspect *and subjects him to interrogation*[,] … there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." (*Williams*, *supra*, 435 F.3d at p. 1159, fn. omitted; see *Seibert*, *supra*, 542 U.S. at p. 613 (plur. opn. of Souter, J.) ["By any objective measure … it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble."]; *id.* at p. 620 (conc. opn. of Kennedy, J.) ["As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that

---

narrowest grounds." (*People v. Rios*, *supra*, 179 Cal.App.4th at p. 504; accord, *Marks v. United States* (1977) 430 U.S. 188, 193.)

*Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained."].)

Between 2:54 p.m. (when Barba informed Echevarria defendant failed the polygraph examination) and 4:09 p.m. (when Echevarria finally advised defendant of his *Miranda* rights), the detectives extensively interrogated defendant using various techniques and obtained a pre-*Miranda* admission as to what had occurred the night of July 22, 2007.  During the post-*Miranda* interview, which lasted approximately 30 minutes, defendant basically repeated his account.  "Because law enforcement officers generally retain control over the timing of a *Miranda* warning and giving the warning to a custodial suspect imposes only a minimal burden" (*Williams*, *supra*, 435 F.3d at p. 1160), we find the detectives' deferral of the warning until after defendant's admission "supports an inference of deliberateness" (*ibid.*).  Moreover, substantial breaks in time between the pre- and post-*Miranda* interviews and curative warnings[20] were conspicuously absent.

As we previously noted, to prevail on an ineffective-assistance-of-counsel claim, a defendant must show both that his counsel's performance was deficient and that the deficient performance resulted in prejudice to defendant.  (*Andrade*, *supra*, 79 Cal.App.4th at pp. 659-660.)  "Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*People v. Wharton*, *supra*, 53 Cal.3d at p. 575.)  At oral argument, the Attorney General conceded the admission of defendant's post-polygraph statements was prejudicial.  We accept this concession.

---

[20]    A curative warning "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and … waiver." (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).)  One example is "an additional warning that explains the likely inadmissibility of the prewarning custodial statement …." (*Ibid.*)

## DISPOSITION

The judgment on counts 1 and 2 and the order appealed from are reversed. The judgment on count 3 is affirmed.

Upon issuance of the remittitur, the clerk of this court is directed to give the required notice to the State Bar of California pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), and to defendant's trial counsel pursuant to Business and Professions Code section 6086.7, subdivision (b), and California Rules of Court, rule 10.1017. (See *In re Jones* (1996) 13 Cal.4th 552, 589, fn. 9; *In re Sixto* (1989) 48 Cal.3d 1247, 1265, fn. 3; *People v. Pangan* (2013) 213 Cal.App.4th 574, 584, fn. 10.)

_____

DETJEN, J.

WE CONCUR:

_____

HILL, P.J.

_____

GOMES, J.

28.