[No. B134730. Second Dist., Div. Six. Apr. 3, 2000.]

THE PEOPLE, Plaintiff and Appellant, v.
OSKER ADRIAN ANDRADE, Defendant and Respondent.

652

## COUNSEL

Michael D. Bradbury, District Attorney, and Peter D. Kossoris, Deputy District Attorney, for Plaintiff and Appellant.

Steve Pell for Defendant and Respondent.

## OPINION

**YEGAN, J.**—Over a half-century ago, Justice Vallee, apparently weary of the repetitive and almost nauseating frequency of appeals challenging the sufficiency of the evidence, reiterated the even then familiar "substantial evidence rule." He then lamented: "No one seems to listen." (*Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].) ▆▆▆ ■ ■ Just two years ago, in *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1448-1450 [77 Cal.Rptr.2d 463], we collected the pertinent precedents concerning appellate review of judicial determinations addressed to the sound discretion of the trial court.[1] The abuse of discretion standard is not arcane and has been a staple of California jurisprudence since statehood. However, attacks upon the exercise of trial court discretion are all too frequent. As Justice Vallee would say: "No one seems to listen."

Here, the People seek to overturn the discretionary granting of a new trial. This is a "daunting task," and an "uphill battle." (*Estate of Gilkison, supra,*

---

[1] " ' "The term [judicial discretion] implies the absence of arbitrary determination, capricious disposition or whimsical thinking. It imports the exercise of discriminating judgment within the bounds of reason. [Par.] To exercise the power of judicial discretion all the material facts in evidence must be known and considered, together also with the legal principles essential to an informed, intelligent and just decision." [Fn. omitted.]' (*In re Cortez* (1971) 6 Cal.3d 78, 85-86 [98 Cal.Rptr. 307, 490 P.2d 819] see also *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200 [280 Cal.Rptr. 565].) 'The appropriate [appellate] test for abuse of discretion is whether the trial court exceeded the bounds of reason.' (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339]; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706].) [¶] A '. . . showing on appeal is wholly insufficient if it presents a state of facts, a consideration of which, for the purpose of judicial action, merely affords an opportunity for a difference of opinion. An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge. To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice . . . .' (*Brown* v. *Newby* (1940) 39 Cal.App.2d 615, 618 [103 P.2d 1018].) ' "A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." [Citations.]' (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rpt. 65, 468 P.2d 193].)" (*Estate of Gilkison, supra,* 65 Cal.App.4th 1443, 1448-1449.)

65 Cal.App.4th at p. 1448.) As we shall explain, there was no abuse of discretion as a matter of law, and the order granting new trial must be affirmed.

A jury convicted Osker Adrian Andrade (defendant) of two counts of first degree burglary (Pen. Code, §§ 459, 460, subd. (a))[2] and unauthorized entry of a dwelling house (§ 602.5), and one count each of attempted false imprisonment (§§ 236, 664), assault with intent to commit rape (§ 220), battery (§ 242), and possession of a knife with the intent to commit assault (§ 12024). After the verdict, defendant discharged his appointed trial counsel, retained new counsel and moved for a new trial on the theory that his prior attorney had not provided effective assistance of counsel. The trial court was, "persuaded . . . the motion just has to be granted. I don't think it's a case that any of us in good conscience can live with in its present posture. . . ."[3]

## Incident I

Julenne G. testified that in February 1997, she spent an evening out with defendant and Steve Sanabria. Defendant made no sexual comments or overtures toward G. while they were out. At the end of the evening, the men dropped G. off at her apartment. Defendant returned within five minutes to pick up a jacket he had left behind. G. was undressing for a shower when she realized that defendant had once again entered her apartment. He refused to leave when she told him to do so. The two engaged in a loud argument. G. tried to leave through the front door but defendant stopped her by grabbing her arm. They struggled. G. screamed. Defendant choked her to stifle the noise. She eventually broke free and ran out the front door. Defendant followed, hitting G. in the back of her head and knocking her to the ground. As she fell, G. heard defendant say, "go ahead and call rape, bitch, because nobody's going to hear you." A neighbor flicked a porch light on and off, causing defendant to run away. During the fight, defendant did not touch G's breasts or crotch.

The argument awoke Ken and Martha McGuire, who live directly above G. Ken testified that he could hear a man and a woman yelling and the sound

---

[2]All statutory references are to the Penal Code.

[3]We do not fault the district attorney for continuing to prosecute this case. We only question the decision to prosecute this appeal. The Legislature has granted the People the right to appeal from an order granting a new trial. (§ 1238, subd. (a)(3).) There are instances where the People may prevail in such an appeal. For example, if the trial court misconstrues a statutory scheme and predicated thereon, finds that defense counsel was ineffective and grants a new trial, the People will prevail on appeal. (*People v. Chavez* (1996) 44 Cal.App.4th 1144 [52 Cal.Rptr.2d 347].) This is not such a case.

of bodies hitting walls. He pounded on G's front door but received no answer. He went back upstairs to call the police. While he was on the telephone, Martha looked out their front window. She saw a car double parked on the street, with its engine running, its headlights on and its emergency lights flashing. Within moments, a man ran across the lawn, got into the car and drove away. Neither Ken nor Martha could identify the man. They did not hear the "call rape" statement to which G. testified.

Sanabria testified that, when they returned to G's apartment, he and defendant went inside to use the bathroom and then left. After they reached the car, defendant wanted to go back inside to get his jacket. Sanabria said he would get the jacket from G. the next day. Defendant accepted this, drove Sanabria home and then left. G. and Sanabria testified that defendant did not have enough time to drive Sanabria home before returning to G's apartment. When questioned by police, defendant denied that he fought with G.

*Incident II*

In July of 1977, Leora L. lived at the home of her fiancé, Eric Lopez. A close friend of defendant's, Paz Trevino, rented a room at the back of the Lopez house. Trevino is a truck driver who is often away from home. On the night of July 25, neither Eric Lopez nor Trevino were home. L. was there with her eight-year old son, Eric's sister-in-law, Michelle Gutierrez, her husband and their children.

About 2:00 a.m., L. awoke to find defendant standing in the doorway to her bedroom. He was wearing a child's toy "Power Ranger" glove on one hand and holding a steak knife in the other. L. walked toward the doorway and turned on the light. Defendant took a few steps backward as she approached. She asked him, "what the hell are you doing here?" Defendant replied, "I [heard] you are alone. I heard you needed a man in the house." L. also heard defendant say "something about being a Power Ranger." L. told defendant that she was not alone because Gutierrez was sleeping on a nearby couch and her brother-in-law was in the next room. Defendant said, "this is crazy," or "this is out-of-control," and left through the back of the house. Defendant never touched L. and did not raise the knife toward her during this confrontation.

Gutierrez woke up and heard some of this exchange. She could not identify the man. Although she saw that he had something in his hand, Gutierrez did not know what it was. She could not recall whether the light was on in L's bedroom at the time.

L. did not report the incident to the police until the next day, after she spoke with Eric Lopez about it. Defendant told police that he was not in the Lopez house that evening.

Trevino was the sole witness called by the defense at trial. Although he is a longtime friend, Trevino was asked no questions about defendant's character or reputation. He could not recall whether he gave defendant a key to the house. Although it was possible defendant had a key, Trevino was "pretty sure" he did not. In a declaration filed in support of the motion for new trial, Trevino stated that he recalled giving defendant a key. The People contend this declaration was a forgery.

### The Motion for New Trial

In the papers filed in support of the motion for new trial, defendant's retained counsel argued that trial counsel rendered ineffective assistance for several reasons: Trial counsel did not interview defendant before the trial began. He did not return the many telephone calls he received from defendant. Trial counsel did not interview potential character witnesses. His attempts to impeach the testimony of the complaining witnesses at trial were unsuccessful because he was not familiar with their prior statements. Trial counsel did not present evidence that defendant's hands are too big to wear the toy glove Lopez described. In his closing argument, trial counsel urged the jury to convict only on the lesser included offenses, arguing there was reasonable doubt on the issue of defendant's intent to rape the victims.

Defendant's wife, Sondra, told a defense investigator that she had a conversation with L. during which L. said the lights were off during the encounter and that she realized defendant was the intruder only after the confrontation was over. In another portion of the same statement, Sondra gave an account of her husband's whereabouts that contradicted his own. Trial counsel did not interview Sondra. He advised her not to testify but did not explain his reasons.

Trial counsel also advised defendant not to testify. At the hearing on the motion for new trial, the prosecutor asked defendant: "Did Mr. [T.] discuss with you the fact that you'd previously lied to police and it would possibly hurt your case if you took the stand and testified?" Defendant answered: "Mr. [T.] did not tell me anything about that if I took the stand. He basically told me that he didn't want me to take the stand. He said it would open up a can of worms, in which I did not know what he was talking about."

At the hearing on the motion for new trial, defendant also testified that he and Sanabria both went inside G's apartment to use the bathroom before returning together to the car. Once at the car, defendant realized he'd left his jacket behind and went back to the apartment to get it. G. was very drunk and refused to give him the jacket. They argued loudly about it and had a

brief physical struggle. Defendant stated in his declaration: "I lunged for the jacket and grabbed for it, my hand hitting her side and head. I pushed her back, my single hand at her neck, grabbed my jacket, and left." Defendant denied intending to rape G., making the "call rape" statement, or engaging in the drawn-out fight she had described at trial.

With respect to the L. incident, defendant stated that he was watching television in Trevino's room with Trevino's permission. He entered the house through the back door, using a key he received from Trevino. Defendant expected the house to be empty. After watching television for about 30 minutes, defendant went into the kitchen and got a glass of water. "L. was awake and confronted me, angrily demanding to know what I was doing there." Defendant left quickly because L. told him to. Defendant denied entering L's bedroom, having a knife in his hand or wearing the glove she described. Defendant admitted that he, "did say jokingly, 'where is your man, I heard he was in jail.' "

Defendant also called eight character witnesses who described him as a devoted husband and father who rarely drinks and is respectful toward women. Defendant's trial counsel did not testify at the hearing on the motion for new trial.

### The Trial Court's Ruling

The trial court granted the motion because it was persuaded that defendant's trial counsel rendered ineffective assistance. In extensive comments from the bench, the trial court noted that, "granting of a new trial is a very rare occurrence. This is the first time I've ever had one that I've granted." Although it mentioned counsel's failure to call character witnesses and inability to impeach the victims' testimony, the trial court's ruling focused primarily on counsel's advice against defendant testifying. According to the trial court, "it appears that the defendant should have been put on the stand to testify. There would have been some credibility issues on the basis of his prior inconsistent statements, his basic denials of the fact that he didn't commit any crimes or even that he was there at the one location. [¶] But he makes a good appearance on the stand, didn't do a bad job today, I thought, and should have been given that opportunity."

The trial court further explained: "[T]here is, from what we now know, a plausible explanation for the presence of the defendant at each of these two places. And he should have had the opportunity to tell the jury about that and

subjected himself to the impeachment which might have been possible, although I'm not persuaded that the force of that impeachment would have been all that great, given the circumstances of how it came about, of how those initial statements came about."

### Standard of Review

As indicated, general rules pertaining to appellate review of the trial court's discretionary rulings are apposite to motions for new trial. The trial court's ruling on a motion for new trial " ' "rests so completely within [its] discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811], quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1318 [248 Cal.Rptr. 834, 756 P.2d 221]; see also 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Appeal, § 3210, pp. 3970-3971.) Although this standard of review is deferential, "it is not empty . . . . [I]t asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162 [69 Cal.Rptr.2d 917, 948 P.2d 429].) The appellant has the burden to demonstrate that the trial court's decision was "irrational or arbitrary," or that it was not " 'grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' [Citation.]" (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977 [60 Cal.Rptr.2d 93, 928 P.2d 1171]; see also fn. 1, *ante*.)

"Where the motion is made on a proper statutory ground, and the record contains some showing in support of it, the judge's discretion in granting is almost invariably upheld; i.e., the appellate court gives the order all of the presumptions in favor of any appealable judgment." (6 Witkin & Epstein, Cal. Criminal Law, *supra*, § 3084, p. 3806.)

### Ineffective Assistance of Counsel

A new trial may be granted where the trial court finds that the defendant received ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People v. Chavez, supra*, 44 Cal.App.4th 1144, 1148.) To prevail on this ground, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the

sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674]; see also *People v. Hester* (2000) 22 Cal.4th 290, 296 [92 Cal.Rptr.2d 641, 992 P.2d 569].)

As a court that reviews the conduct of counsel in hindsight, we are reluctant to second-guess tactical decisions made by trial counsel. (*People v. Holt* (1997) 15 Cal.4th 619, 703 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *In re Fields* (1990) 51 Cal.3d 1063, 1069-1070 [275 Cal.Rptr. 384, 800 P.2d 862].) We are equally, if not more reluctant, to second-guess the trial court's discretionary ruling that defense counsel's tactical decisions made before it resulted in an unfair trial, i.e., a miscarriage of justice. In this respect, an ineffective assistance claim made in a motion for new trial differs from one raised for the first time on appeal or petition for writ of habeas corpus. "After all, the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney." (*People v. Jones* (1981) 123 Cal.App.3d 83, 89 [176 Cal.Rptr. 398].)

■ The primary purpose of the requirement that counsel render effective assistance is, "to ensure a fair trial . . . ." (*Strickland v. Washington, supra,* 466 U.S. 668, 686 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692].) Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Ibid.*; see also *People v. Earp* (1999) 20 Cal.4th 826, 870-871 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Hart* (1999) 20 Cal.4th 546, 623-624 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

■ Here, after an exhaustive evidentiary hearing, the trial court factually found that defense counsel was ineffective when counsel advised defendant not to testify, and that defendant was prejudiced by the advice. As the trial court noted, defendant was not subject to substantial impeachment and was the only witness who could provide "a plausible explanation for [his] presence" in the victims' homes. Without his testimony, the jury had little alternative but to accept the People's theory that defendant entered each residence to commit a rape. Although defendant's credibility would have been damaged by his initial lies to police, "the force of that impeachment

would [not] have been all that great . . . ." Defendant had no substantial prior criminal record and, according to the trial court, made "a good appearance on the stand[.]"

Thus, the trial court granted defendant a new trial because it found that, as a result of defense counsel's tactical decision not to call defendant as a witness, the trial produced an unjust result that the court could not "live with." Having made these findings, the trial court had no alternative but to grant a new trial.

In theory and in practice, there comes a time when a tactical decision is so unreasonable that the trial court is compelled to intervene. The trial court found that this was such a case. Yet, dismissing the finding as arbitrary, the People seek to force the trial court to sentence the defendant, despite its belief that the result was unfair. We cannot grant this request. "[C]riminal defendants, regardless of their guilt or innocence, are entitled to a fair trial . . . ," and the trial court is obligated to grant a new trial if it finds the result of the first trial to have been unfair. (*People v. Sherrod* (1997) 59 Cal.App.4th 1168, 1174-1175 [69 Cal.Rptr.2d 361].)

A trial court serves as a "gatekeeper" on a motion for new trial. It opens the gate only rarely, a testament to the fact that the vast majority of trials resulting in conviction are fairly conducted. In these cases, motions for new trial are routinely made, routinely denied, and are routinely affirmed on appeal. In the remaining cases, however, the trial court grants the motion, and we affirm those rulings in the absence of a clear showing of abuse of discretion. (*People v. Sherrod, supra,* 59 Cal.App.4th at p. 1175.)

On the facts of this case, we cannot say that the trial court's decision exceeded the bounds of reason or was arbitrary, capricious, or whimsical. (*Estate of Gilkison, supra,* 65 Cal.App.4th at p. 1450.) Accordingly, we affirm the order.

We close with one final observation. We do not declare "open season" for a shift in trial tactics that would allow a defendant to remain silent at trial and gamble on a favorable verdict, knowing that he or she will get a new trial simply by saying, "I wanted to testify but my lawyer told me not to." In this situation, the defendant must still persuade the trial court that the two-prong *Strickland* standard (*ante,* at pp. 659-660) has been met. This is itself a daunting task. In those rare situations where the defendant meets

this task, the trial court's discretionary ruling will "almost invariably [be] upheld." (6 Witkin & Epstein, Cal. Criminal Law, *supra*, § 3084, p. 3806.)

The order granting a new trial is affirmed.

Gilbert, P. J., and Perren, J., concurred.