Filed 1/15/16  P. v. Ross CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066786 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD241238) |
| RICHARD ERIC ROSS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth K. So, Judge.  Affirmed.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland, Scott C. Taylor and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Richard Eric Ross of numerous sex crimes against two girls under 10 years of age, Breanna L., the daughter of his then girlfriend, and Hannah C.,

Breanna's stepsister.[1]  (All further statutory references are to the Penal Code.)  The trial court denied Ross's motion for new trial based on a claim of ineffective assistance of counsel.  After an evidentiary hearing the court found his attorney's conduct met an objective standard of reasonableness, and he did not meet his burden of showing prejudice.  The court sentenced him to prison for 120 years to life plus 17 years.

On appeal, Ross renews his ineffective assistance of counsel claim.  His principal contentions are that his attorney erred by not calling a retained child psychologist to testify as an expert on the issue of suggestibility in sexual abuse claims, and by not calling Ross to testify on a variety of topics.  We agree with the court's assessment, and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

T.R. and Allan L. married in 1996, and their child Breanna was born in 2004.  T. and Allan met Ross in 2001 through a real estate transaction.  On one occasion in 2007,

---

[1]     The jury convicted Ross of the following crimes against Hannah arising from a single incident:  attempted sexual penetration of a child 10 years of age or younger (Pen. Code, §§ 664, 288.7, subd. (b); count 1); forcible lewd act on a child (§ 288, subd. (b)(1); count 2), and; lewd act on a child (§ 288, subd. (a); count 3).  The jury convicted Ross of the following crimes against Breanna arising from multiple incidents:  four counts of oral copulation of a child 10 years of age or younger (§ 288.7, subd. (b); counts 4, 5, 7 and 14); three counts of sexual penetration (§ 288.7, subd. (b); counts 10, 12 and 15); and four counts of lewd act on a child (§ 288, subd. (a); counts 6, 11, 13 and 16).  On counts 2, 3, 6, 11, 13 and 16, the jury found true allegations that Ross had substantial sexual conduct with the children (§ 1203.066, subd. (a)(8)).  On counts 3 and 13, the jury found true allegations that Ross committed sexual crimes against more than one victim (§ 667.61, subds. (b), (c), (e)).

they engaged in a "threesome" after attending a wedding.[2]  Approximately two months later, T. and Allan separated.  She began dating Ross, and in 2009 they began living together.  She and Allan shared equal physical custody of Breanna.

In 2010 Allan married Melissa L.  Melissa has a daughter, Hannah, who is approximately a year older than Breanna.  Hannah and Breanna attended the same school, and occasionally when Allan and Melissa went to work early they would drop Hannah off at T. and Ross's home for a ride to school.

On May 21, 2012, Ross was scheduled to take both girls to school.  Melissa dropped Hannah off at his home early that morning.  T. was upstairs getting ready for work.  Ross asked Hannah for a hug, and she complied.  He gave her some cereal, and after she ate he said, "Come here, I want a better hug."  He hugged her and said, "You're almost a woman," and, "You have perfect legs."  He touched her thighs, "bikini area," bottom, and chest, over her clothes.  She tried to get away from him, but he tightly gripped her waist.  Ross was watching a video on his computer, which she described as "this girl" and "some guy" "doing stuff" to each other "on the counter of [a] library."

Hannah went upstairs to find Breanna.  Ross also went upstairs.  After T. left for work, Breanna asked him if he would play a game called "find us," in which the girls would hide under the covers of the bed in the master bedroom and he would try to pull them out of bed by their feet.  Ross pulled Hannah out of bed by her waist, and her pants

---

[2]     We include this detail because it pertains to the defense theory.

were pulled down "a little bit." She thought it was an accident, and she pulled them back up.

After the game, Ross and the girls stayed in the bed and watched television. Hannah was between Ross and Breanna, and they were all under the covers. He pulled Hannah's pants and underwear down to her knees and put his finger on the "inside part" of her "bikini area."

Hannah was frightened, and she told Ross she had to use the bathroom. She pulled up her clothing and went to the bathroom and cried. Breanna followed her. Hannah asked whether Breanna knew what Ross had done, and Breanna said she did. Hannah also asked if Ross ever touched Breanna, and she denied any touching.

Hannah went downstairs and ran out the front door barefoot. Ross chased after her and found her hiding behind some motorcycles. He grabbed her arm, and when he let go she ran to the house to get her backpack. He chased her again, but he hurt his ankle. He and Breanna went into the house and she "sat on the stairs, crying." He said, "Sorry if I hurt you." She asked to use a phone and Ross complied. She reached Allan and told him Ross had touched her. She was "hysterical" on the phone.

Allan and Melissa immediately went to retrieve Hannah. Melissa grabbed Hannah and took her to the car. Hannah "was bawling" and told Melissa what happened. Ross initially objected to Breanna leaving the house, but Allan was able to remove her. She was also crying. Melissa asked Breanna if Ross had ever touched her, and she pointed to her "private parts" and said he had touched her there.

Allan and Melissa had called 911, and deputy sheriffs arrived and took statements from them and Ross. They did not take statements from Breanna or Hannah, because in sexual abuse cases involving young children there are "specialized people that do the interviews."

On May 30, 2012, the children underwent videotaped forensic interviews at a hospital. The interviews were admitted into evidence at trial. Additionally, Breanna and Hannah testified. Hannah testified to the above facts from the May 21, 2012 incident.

Breanna testified to a lengthy course of sexual abuse by Ross. Breanna lived with T. and Ross in three different homes, and she did not recall any abuse in the first home. She testified that in the living room of the second home, Ross "was touching me . . . whenever my mom was . . . at work." She said he touched her with his hands and his mouth "[i]n my private parts," the area where "pee comes out." She said he would pull her pants and underwear off. He would ask her to remove her shirt, and she would comply. He touched her bare skin more than once, and he touched her over her clothes once. When asked whether he touched the outside or inside of her private part, she responded, "I think it was only the outside, maybe." She also said he "would lick my private part." He once promised her ice cream in exchange for the touching, but he did not follow through.

Breanna testified that in the second home, she saw Ross's "private part," meaning the "part that a boy pees out of." She said they both had their clothes off and "he peed on me, in my private part, the one below the stomach. And I didn't like it." She described the feeling as "weird and stinging." After he peed on her he "just went to the bathroom to

5

get a towel." Before peeing on her, he put "liquid stuff" that "looks like water" on her private part. When asked whether he ever "touch[ed] your private with his private," she responded, "Not that I know of, no."

Further, Breanna testified that in the third home, Ross "kept on doing it," and "I said to stop it," but "I don't think he ever did." She said, "He would do the same thing. He would touch me in my private parts." He would ask her to take her shirt off, and he would pull her pants off. He touched the skin on the outside of her private part more than once. He also put his mouth on her chest "more than once, but not very often." She explained that he "would make me lie upside down" on the couch so he could touch her private part. He told her, "It's okay," and, "Don't tell anybody." She said she was too scared to tell anyone "[b]ecause I thought he was going to get me in trouble because he looked like a really strong guy."

Additionally, Breanna testified that Ross put "a little buzzy toy" inside her private part. She explained it "had a little buzzy thing on the very top," and "it was kind of like the microphone thing at the very bottom, but it was fatter." The first time he used it on Breanna, he said, "I got us a new toy." The "toy" had different speed settings, and he would ask her, "Would you like it on low, medium or fast?" She said, "I think he turned it onto medium, and he would just put it on my private part, and it would buzz." She could feel the buzz inside and outside of her private part. She told Ross, "I didn't want to use it anymore, so he said he would throw it away, but he didn't. And then he said I could. And I threw it away."

6

As to the May 21, 2012 incident, Breanna denied seeing Ross touch Hannah. Breanna said "it looked like something happened in the bed" because Hannah "ran into the bathroom and was freaking out." Hannah told Breanna, "I'm scared," and, "I'm grabbing my backpack and running to school or walking." Breanna saw Hannah run from the home and Ross run after her. When they returned, Hannah asked for the phone so she could call her mother, and Breanna heard Ross say, "Don't tell her what happened."

T. testified she kept two vibrators in her nightstand, one of which she called the "silver bullet," along with a clear lubricant. Before the May 21, 2012 incident, Ross called T. at work and told her he had thrown the silver bullet away because "he went upstairs and heard something in the drawer, opened it, and noticed the vibrator . . . was on, and thought that it could be a fire hazard or something." T. also testified that after the sheriffs left her home after the incident with Hannah, she took Ross to a hospital because "[h]e said he tore his achilles tendon from running after Hannah."

Karina K., a cousin of Breanna, testified that when she was 14 years old she visited Breanna and Ross in their home when T. was away. Ross took Karina into a bedroom and closed the door. He pulled down his pants to expose his penis and said, "You can touch it if you want." He was holding his penis "and playing with it." Karina said no and left the room. She did not report the incident because Ross told her to "keep this between them" and she "was scared he would . . . do something or . . . come after me."

7

Ross's defense theory was that Breanna and Hannah were lying, and their claims resulted from suggestions given by Allan and Melissa. Ross argued that Allan hated him because the "threesome" resulted in the breakup of his marriage to T., and Melissa disliked him because she believed he was controlling and manipulative in matters pertaining to Breanna. Allan was supposedly "looking for this opportunity for the ultimate payback," and intended "to break up [Ross's] life the same way he broke up his marriage." Allan's "number one goal" was supposedly to "remove him from that family so that they can continue going on about their business without him."

Defense counsel also emphasized the prosecution had no physical evidence. A detective testified he did not request medical examinations of the girls because nine days had passed between the incident with Hannah and their forensic interviews, when the extent of the molestations was revealed, and he believed examinations conducted more than 72 hours after a molestation would not yield results. Defense counsel criticized the detective for not having forensic examinations conducted earlier, and she challenged his belief that medical examinations must be conducted within 72 hours to yield results.

DISCUSSION

I

*Applicable Law*

A criminal defendant has a constitutional right to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422, disapproved of on another ground by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To

8

establish a violation of this right, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-217.) " 'The burden of sustaining a charge or inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.' " (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

As to prejudice, "the question is whether there is a reasonable probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, *supra*, 466 U.S. at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland*, at p. 686.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

9

the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, a defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'  [Citation.]"  (*Strickland*, *supra*, 466 U.S. at p. 689.)

Claims of ineffective assistance of counsel "are ordinarily best raised and reviewed on habeas corpus."  (*People v. Williams* (2013) 56 Cal.4th 630, 690.)[3]  Here, however, we have an evidentiary record because Ross raised the issue in a motion for new trial.  We typically review a ruling on a new trial motion under an abuse of discretion standard.  (*People v. Turner* (1994) 8 Cal.4th 137, 212, disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.)  However, a motion for new trial based on the constitutional right to effective assistance of counsel is a nonstatutory motion, and the standard of review for an order denying the motion is expressed differently.  (*People v. Fosselman* (1984) 33 Cal.3d 572, 583; *People v. Taylor* (1984) 162 Cal.App.3d 720, 724 (*Taylor*).)

In such a case, we defer to the trial court's factual findings, express or implied, and uphold them if they are supported by substantial evidence.  (*People v. Valdez* (2010) 49 Cal.4th 715, 730 (*Valdez*).)  " 'The deference accorded factual findings derives from the fact the [court] had the opportunity to observe the demeanor of witnesses and their manner of testifying.' "  (*Ibid.*)  "On appeal, all presumptions favor the trial court's

---

3      Ross raises an additional claim of ineffective assistance of counsel that goes beyond the record on appeal and is decided by separate order.

exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences." (*Taylor*, *supra*, 162 Cal.App.3d at p. 724.) We review the court's conclusions of law and resolution of mixed questions of fact and law independently. (*Valdez*, at p. 730.) "Mixed questions 'include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense.' [Citation.]" (*Ibid.*)

## II

*Analysis*

### A

*Oliver's Decision Not to Call Retained Expert*

Ross contends his trial counsel, Euketa Oliver, rendered ineffective assistance by not presenting "significant exonerating evidence." He claims she erred by not calling Dr. Eisen, a child psychologist she retained on Ross's behalf to testify on the "concept of suggestibility."

Oliver testified that Dr. Eisen was concerned about whether he could assist the defense because it appeared that Hannah immediately reported sexual abuse. Before testifying he wanted to know how she and other prosecution witnesses testified on the issue of reporting. When Oliver informed Dr. Eisen that Hannah and other witnesses established her disclosure was immediate, he cautioned Oliver, "If you call me to testify, it would be harmful to the defense because Hannah reported immediately. And it doesn't sound as if there was any input from any outside source as to what she described

11

happened." Oliver asked Dr. Eisen whether he could assist the defense insofar as Breanna was concerned, because she did not immediately report abuse, and he responded, "I'm afraid that, if I take the stand, that I'm going to end up reinforcing the prosecution witnesses. And so I think it's better for you not to call me at all."

"[A] reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[C]ounsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "Whether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate." (*Id.* at p. 334)

Based on Dr. Eisen's warning he would likely *harm* the defense, we conclude Oliver's decision not to call him met an objective standard of reasonableness. It appears she would have been remiss in calling him. Ross offers no explanation of why she should have called Dr. Eisen despite his warning.

Further, the concept of suggestibility *was* before the jury because two prosecution witnesses testified about it. Christina Schultz conducts forensic interviews for the Palomar Health Child Abuse Program, and she interviewed Breanna and Hannah. Oliver asked Schultz, "What is 'suggestibility'?," and she responded that "[s]uggestibility could be in terms of a child . . . being easily swayed because of the way you ask the question." Schultz explained that the younger the child, the more susceptible he or she is to

12

suggestion. Schultz testified Breanna described some events that she later clarified did not occur. Rather, someone else had told her about them.

Laurie Fortin is a supervisor at the Chadwick Center at Rady's Children's Hospital. Fortin testified that "very young kids, preschool-age children," are "highly suggestible," and "suggestibility decreases with age." Oliver questioned her on studies on the issue.

Under these circumstances, Ross has not shown prejudice. He emphasizes that a defense attorney must engage in adequate pretrial investigation, but the issue of whether Oliver should have called Dr. Eisen to the stand does not pertain to the adequacy of her investigation.

B

*Oliver's Advice that Ross Not Testify*

1

Ross also contends Oliver erred by not calling him to testify on a variety of topics. He asserts he would have testified that when he was arrested he "asked the police to perform a SART[4] or DNA test on the girls." He claims "[t]his is the action of an innocent man." He also would have testified he has a scar in the groin area, to impeach the testimony of Breanna and Karina that they saw him with his pants down; Breanna saw him and T. having sex, to show "she was no stranger to adult sexual activity"; and he heard a conversation between Allan and T. on speaker phone, to impeach Allan's

---

4    The acronym SART refers to Sexual Assault Response Team. (*People v. Andrews* (2015) 234 Cal.App.4th 590, 594; *People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1243.)

testimony he did not speak to Breanna or Hannah about the abuse before they gave their forensic interviews.

Oliver testified that in several pretrial meetings with Ross they discussed whether he should testify. He advised her that he had "previous law enforcement experience" in the military, and she was concerned that his knowledge of how investigations are conducted could be used against him. Further, during mock cross-examinations Ross consistently became angry when asked questions that made him uncomfortable. Oliver testified: "The areas of concern, those never changed. . . . Ross would get angry, not lashing out or anything of that nature, but the way he would convey certain information, the way he would portray himself, his body language, his facial expressions, his mannerisms, things of that nature, those would not change."

Oliver was also concerned about how Ross may describe Breanna and Hannah in his testimony. Oliver explained that when she referred to Hannah as a child or young girl, Ross "would say things like 'Well, . . . she's no regular child. She's not like a child at all. She's more like an adult. She's very manipulative. She's very savvy and sassy,' . . . 'like her mother.' " Oliver advised Ross that if he testified,
" 'subtleties . . . would come out in your testimony that I think would be more harmful.' "

During trial, Oliver and Ross revisited the issue of his testimony several times. Oliver was especially concerned after Hannah testified that Ross told her, "You're almost a woman," and, "You have perfect legs," descriptions that mirrored the way Ross described Hannah to Oliver. Sometime before the close of evidence, Ross asked Oliver

14

whether he should testify, and she responded, "My advice is the same. I don't think you should testify, but you have a right to testify. So if you want to testify, then you have to let me know." Oliver testified that based on her advice Ross did not testify.

Ross testified that he left his testimony to Oliver's discretion "as long as my evidence was brought forth in some manner." He explained that when Oliver rested the defense case without introducing any evidence of his scar, he asked her when "do I get to put in this evidence," and she said "we couldn't get it in because . . . [T.] . . . didn't remember it." He said, "I'll go on the stand," and she responded, "It's too late. The defense has rested."

During direct examination, Oliver testified Ross never told her before or after the close of evidence that he wanted to testify. When pressed on cross-examination on whether he told her *after* the close of evidence that he wanted to testify, she stated she did not recall him doing so, but "I can't say that it did not happen, like I can't say that it did happen."[5]

The issue of whether Ross notified Oliver after the close of evidence that he wished to testify is immaterial because he did not notify the court of his wish. Had he done so the court had broad discretion to reopen the evidence. (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208.) Instead, he remained silent until convictions were

---

[5]     The statement in Ross's opening brief that "[w]hen asked at the new trial motion whether [Oliver] discussed with [him] the idea of him testifying *before* she rested the defense case, she said she couldn't recall," is erroneous. (Italics added.) Her testimony that "I can't say that it did not happen, like I can't say that it did happen," pertains only to whether he told her *after* the close of evidence that he wished to testify. Similar statements in Ross's reply brief are incorrect for the same reason.

15

rendered against him, and then he moved for a new trial before a different jury. *People v. Guillen* (1974) 37 Cal.App.3d 976, 985, discusses the "obvious unreasonableness of such an approach."

"While the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition: The defendant must timely and adequately assert his right to testify. [Citation.] Without such an assertion, '. . . a trial judge may safely assume that a defendant who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's strategy.' [Citations.] When the record fails to show such a demand, a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify, he was deprived of that opportunity." (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231; *People v. Enraca* (2012) 53 Cal.4th 735, 762-763; *People v. Alcala* (1992) 4 Cal.4th 742, 805-806; *People v. Guillen*, *supra*, 37 Cal.App.3d at pp. 984-985.)

Absent a timely assertion of the wish to testify, a defendant "is bound by his counsel's decision and must seek relief, if any is due, by showing ineffective assistance of counsel." (*People v. Hayes*, *supra*, 229 Cal.App.3d at p. 1232, citing *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 545 ["if a defendant does not testify at his trial because of some misconception on the part of his lawyer, his real complaint is that he was denied effective representation by counsel"].) However, advising a client not to testify "goes to the heart of trial tactics [citations], and for that reason *rarely would*

16

*support a claim of ineffective assistance of counsel*." (*People v. Lucas* (1995) 12 Cal.4th 415, 444, italics added; *People v. Trotter* (1984) 160 Cal.App.3d 1217, 1224-1225.)

Ross's reliance on *People v. Andrade* (2000) 79 Cal.App.4th 651 (*Andrade*), is misplaced. *Andrade* affirmed an order granting the defendant's motion for new trial based on his attorney's advice not to testify. The trial court determined that "as a result of defense counsel's tactical decision not to call defendant as a witness, the trial produced an unjust result that the court could not 'live with.' " (*Id.* at p. 661.) *Andrade* explains: "In theory and practice, there comes a time when a tactical decision is so unreasonable that the trial court is compelled to intervene. The trial court found that this was such a case. . . . [¶] On the facts of this case, we cannot say that the trial court's decision exceeded the bounds of reason or was arbitrary, capricious, or whimsical." (*Ibid.*)

*Andrade* applied an abuse of discretion standard of review and gave deference to the trial court's findings. (*Andrade*, *supra*, 79 Cal.App.4th at p. 659; *People v. Callahan* (2004) 124 Cal.App.4th 198, 201.) Here, unlike the situation in *Andrade*, the trial court implicitly found that Oliver's reasons for advising Ross not to testify were sound. Substantial evidence supports the finding, and thus we defer to it. She gave a great deal of thought to the matter both before and during trial, and she had the opportunity to assess his performance and demeanor in several mock cross-examinations. She feared that he would make a poor witness and reinforce unfavorable testimony of Hannah and other witnesses. She believed his testimony "would be more damaging than helpful." Based on the court's finding, we conclude Oliver did not provide ineffective assistance on

17

this issue.  She is an experienced trial attorney, and it was incumbent on her to give Ross her best advice.

2

The above discussion is dispositive, but we also note Ross has not shown the result would have been more favorable with his testimony.  He wanted to apprise the jury that Allan hated him, to suggest he had a motive to persuade Breanna and Hannah to lie.  Oliver elicited testimony from Allan that he and T. had a sexual encounter with Ross after they all attended a wedding, and Allan believes her relationship with Ross caused the breakup of the marriage.  Allan nonetheless said he did not "dislike" Ross and their relationship was "civil."

Oliver argued during closing that Allan's denial of disliking Ross was not credible, and Allan was "extremely upset" with Ross and his "number one goal was to remove . . . Ross from that family . . . so that they can continue going on about their business without him."  The evidence, however, showed that occasionally when Allan and Melissa had to go to work early they dropped Hannah off at Ross's home for a ride to school.  The day Hannah reported sexual molestation, Ross was scheduled to give her a ride to school and Melissa dropped her off early at his home.  That cooperative arrangement does not connote ill-will toward Ross, and thus it is not surprising the jury rejected the defense theory.

Further, Ross does not specify any particular testimony that would impeach Allan's credibility.  The motion for new trial merely stated Allan and Melissa harbored "animosity against him beginning when he got involved with [T.] . . . when she was still

18

married to Allan . . . but especially from 2009 when he lived with [T.] . . . and [Breanna]."  At the hearing, Ross was asked whether Allan's denial of disliking him was "consistent with your belief as to how the relationship was between you and Allan," and he responded, "Not at all, Sir."  Ross was also asked whether he believed Allan's denial of disliking him was "a true statement," and he responded, "No, sir."  The court, however, sustained an objection to the latter question based on speculation.  Speculative testimony is inadmissible (*County of Los Angeles v. Beverley* (1954) 126 Cal.App.2d 89, 93), and Ross does not explain how he could impeach Allan's denial of disliking him with non-speculative testimony.

Additionally, Ross wanted the jury to know Breanna "was no stranger to adult sexual activity," to suggest she had the knowledge to fabricate molestation claims.  He concedes, however, that other evidence was adduced on that issue.  He points out that in her forensic interview, she admitted watching an adult video on a site he had forbidden her to view.  Further, in the interview she stated that in "the first old house" Ross and T. "kept on doing it."  Breanna also made a statement that Ross construes as meaning "at the new house she peeked from the hallway to watch her mother having sex."  He also cites Breanna's testimony that she believed the vibrator he used on her was kept in a nightstand in the master bedroom.  It is unlikely that Ross's cumulative testimony on the point would have swayed the jury.

Ross also wanted to testify that when he was arrested he requested that Hannah and Breanna be tested for the presence of his DNA.  He asserts that a guilty man would not make such a request.  He was not arrested, however, until nine days after Hannah

19

reported molestation, and Breanna's molestations predated Hannah's molestation. Further, Hannah did not accuse him of sexual intercourse, she accused him of touching her vagina with his finger. Under these circumstances, a request for DNA testing is unconvincing.

Ross also asserts he could have impeached the credibility of Breanna and Karina by testifying he has a three-inch surgical scar in his groin area, which they did not mention. Karina testified that Ross pulled his pants down "just far enough" to expose his penis. He was "playing with it," which may have obscured any scar. Further, Karina's testimony that she did not notice any scar is consistent with T.'s testimony she did not recall that Ross had a scar in the groin area. T. and Ross had an intimate relationship for several years.

Further, Ross's testimony on the issue would not affect the convictions for molesting Hannah, as she did not claim he had his pants off. Breanna testified that Ross had his pants off when "he peed on me, in my private part," but the jury exonerated Ross of the four charges against him that alleged sexual intercourse with Breanna. Impeachment of her testimony she saw him naked was unnecessary, and it would not likely affect the results on the numerous other charges against him pertaining to her. Breanna gave detailed testimony regarding his use of a vibrator on her, and T.'s testimony that Ross called her at work to tell her he threw away one of her vibrators is consistent with Breanna's testimony that Ross gave her permission to throw away that vibrator he used on her.

20

Additionally, Ross asserts he could have impeached Allan's testimony he did not discuss the details of the girls' claims before the forensic interviews, by testifying he heard a conversation on speaker phone between Allan and T. in which Allan "was discussing matters that had been discussed between himself and the two alleged victims." Ross, however, does not specify what the "matters" discussed were, or his exact proposed testimony. Breanna's and Hannah's testimony was overwhelming evidence of guilt, and to establish a right to relief based on ineffective assistance of counsel, the " ' "proof . . . must be a demonstrable reality and not a speculative matter." [Citation.]' " (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007.)

C

*Hannah's Claim of Prior Touching*

Additionally, Ross contends Oliver erred by not questioning Hannah on a "false claim" she made during her forensic interview that Ross "had touched her inappropriately before the May 2012 incident." He asserts that since no charge was brought on that claim, the prosecution must have realized it was false, and thus the questioning would have impeached Hannah's credibility.

Hannah stated "there was another time when [Ross] hugged me and touched my bottom." Oliver did not recall the statement, and thus she had no explanation for not questioning Hannah on it. "Because it is inappropriate for a reviewing court to speculate about the tactical bases for counsel's conduct at trial [citation], when the reasons for counsel's actions are not readily apparent in the record, we will not assume constitutionally inadequate representation and reverse a conviction unless the appellate

21

record discloses ' "no conceivable tactical purpose" ' for counsel's act or omission." (*People v. Lewis* (2001) 25 Cal.4th 610, 674.)  The record does not disclose Oliver lacked any tactical reason for not broaching the statement.  Further, Ross has not satisfied his burden of showing prejudice related to the issue.

## DISPOSITION

The judgment is affirmed.


McDONALD, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.